Dee **ANDERSON** and T.C.
**Tubb, Appellants,**

v.

**VINSON EXPLORATION, INC. and
M.C. "Morty" Vinson, Appellees.**

No. 08–91–00201–CV.

Court of Appeals of Texas,
El Paso.

June 3, 1992.

Rehearing Overruled July 8, 1992.

W. Clayton Gaston, Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, for appellants.

Dick R. Holland, James P. Boldrick, Boldrick & Clifton, Midland, for appellees.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This is a suit for unpaid charges for goods and services incurred by the operator in connection with an oil and gas joint operating agreement. The trial court submitted questions to the jury on the operator's damages and attorney's fees and on the investors' counterclaim for common law fraud. However, the trial court refused to submit questions, definitions and instructions on the investors' other causes of action for damages under the Texas Securities Act, the Texas Deceptive Trade Practices Act and for breach of implied warranties, directing a verdict against investors on those causes of action. The investors appeal from an unfavorable verdict and judgment, claiming in forty-six points of error that the trial court erred by directing verdicts and by refusing to submit questions on such causes of action. We affirm in part and reverse and remand in part.

## FACTS AND ALLEGATIONS

In late 1987, T.C. Tubb and his son-in-law, Dee Anderson, Appellants, met with M.C. "Morty" Vinson, owner along with his son, Bryan, of an oil and gas operating company, Vinson Exploration, Inc. (VEI or Appellees), on at least two occasions to discuss an oil and gas prospect and the purchase of the "Shannon 12–A Lease" located in Crockett County, Texas. The discussions culminated in Appellees agreeing to purchase the entire lease, then assigning it or a part of it with 100 percent of the working interest to Appellants and with VEI to receive a $10,000 finder's fee plus a 3 percent overriding royalty interest in the production and to act as operator of the lease. The parties subsequently entered into a joint operating agreement on December 1, 1987 and the lease was later assigned by VEI to Appellants.

VEI then located, drilled and operated four wells on the 12–A Lease. The actual cost of drilling the first well was approximately double the estimate made under the original Authority for Expenditure, the well having taken 82 days to complete by cable tool. Before completion of the first well, Morty Vinson advised the Appellants to drill a second well, although the first well was correctly predicted not to be a commercially viable well at that time. The second well was drilled with an air rig and was initially successful in its production. During this successful period, Morty Vinson encouraged the Appellants to drill wells three and four.

Appellants assert that they were led to believe the wells were to be probable producers and that the operating expenses would be greatly less. This apparently turned out to be untrue. Appellants then refused to pay any further invoices from the Appellees. VEI was removed as operator in August of 1988.

Appellees sued to recover the amount owed for goods and services under the joint operating agreement. Appellants counterclaimed for damages under the Texas Securities Act, under the DTPA, and for breach of contract, negligence, gross negligence, breach of warranty and common law fraud. The basic allegations were that the Appellees had misrepresented the profitability of the venture and their skills in discovering and producing oil.

Also in contention is an option that was exercised on an additional 160 acres known as the "12–B Lease" through the arrangement of Morty Vinson. Tubb exercised the option and paid $35,000 for the lease, but Anderson never committed himself to the purchase. No written assignment was executed and there was some question as to certain credits due Tubb. The trial court directed a verdict on all counterclaim causes of action except the one alleging fraud.

## STANDARDS OF REVIEW

Many of the points of error complain of the directed verdict. A directed verdict is proper: (1) when a defect in the opponent's pleadings makes them insufficient to support a judgment; (2) when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) when the evidence offered on a cause of action is insufficient to raise an issue of fact. *McCarley v. Hopkins*, 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ); *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930, 932 (Tex. App.—San Antonio 1989, writ denied).

In reviewing the granting of a directed verdict by the trial court on an evidentiary basis, the reviewing court will "determine whether there is any evidence of probative force to raise fact issues on the material questions presented." *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). The appellate court should consider all of the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences arising therefrom. *White v. Southwestern Bell Telephone Company, Inc.*, 651 S.W.2d 260, 262 (Tex.1983). If there is any conflicting evidence of probative force on any theory of recovery, the issue is for the jury; an instructed verdict is improper and the case must be reversed and remanded for the jury's determination on that issue. *White*, 651 S.W.2d at 262; *Jones v. Tarrant Utility Company*, 638 S.W.2d 862, 865 (Tex.1982); *Collora*, 574 S.W.2d at 68. Where no evidence of probative force on an ultimate fact element exists or where the probative force of the testimony is so weak that only a mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict. *University National Bank v. Ernst & Whinney*, 773 S.W.2d 707, 709-10 (Tex.App.—San Antonio 1989, no writ).

The same "no evidence" standard of review of directed verdicts exists for refusing to submit jury questions. *Phillips Pipeline Company v. Richardson*, 680 S.W.2d 43, 48 (Tex.App.—El Paso 1984, no writ).

To determine if the trial court has erred in refusing to submit requested questions, the reviewing court reviews the evidence as if the court had instructed the verdict. *Id.*

The trial court has more discretion when submitting instructions and definitions to the jury than it has in submitting jury questions. *Harris v. Harris*, 765 S.W.2d 798, 801 (Tex.App.—Houston [14th Dist.] 1989, writ denied). The trial court should issue explanatory instructions and definitions so as to enable the jury to render a verdict. *Mobil Chemical Company v. Bell*, 517 S.W.2d 245, 256 (Tex.1974). Where an instruction is requested and refused, the question on review is whether there was abuse of discretion on the part of the trial court. *Lumbermens Mutual Casualty Company v. Garcia*, 758 S.W.2d 893, 894 (Tex.App.—Corpus Christi 1988, writ denied). The test for determining whether a trial court has abused its discretion in refusing to submit instructions or questions to the jury is that an error on failing to instruct must have caused or can be reasonably calculated to have caused the rendition of an improper verdict. Tex. R.App.P. 81(b); *Atlantic Mutual Insurance Company v. Middleman*, 661 S.W.2d 182, 187 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

## TEXAS SECURITIES ACT

In Points of Error Nos. One through Four, Six through Nine, Eleven through Fifteen and Seventeen through Twenty–Three, Appellants allege error by the trial court in directing a verdict against them on their anti-fraud claim under the Texas Securities Act, Tex.Rev.Civ.Stat.Ann. art. 581–33 A(2) (Vernon Supp.1992), and in the trial court's failure to submit jury questions, instructions and definitions relating to that claim. Points of Error Nos. Five, Ten and Sixteen relate to the court's actions in directing a verdict and refusing to give a requested question and instruction relating to damages connected with the Securities Act cause of action.

The elements of an action arising under the anti-fraud provision of the Securities Act include an offer or sale of a

security by means of either an untrue statement of a material fact or an omission of a material fact which is necessary in order to make the statement made, in light of all of the circumstances, not misleading. The buyer of the security may sue at law or in equity for rescission, or for damages if the buyer no longer owns the security. *Id.*

An assignment of an interest in an oil and gas lease is a "security" as defined in Article 581–4 A of the Texas Securities Act. *Dunbar v. RKG Engineering, Inc.*, 746 S.W.2d 314, 315 (Tex.App.—Texarkana 1988, no writ). An "investment contract" is also included within the definition of a security. An "investment contract" is defined as (1) an investment of money, (2) in a common enterprise or scheme, (3) with the expectation of profits, (4) which profits will be derived solely from the efforts of others. *Searsy v. Commercial Trading Corporation*, 560 S.W.2d 637, 640 (Tex.1977).

It is uncontested that VEI conveyed the 12–A Lease by assignment. The Appellants had a working interest in the oil and gas lease. There was testimony that the Appellants invested substantial amounts of money with an expectation of profits from their investment. Tubb and Anderson pooled their funds in a common enterprise, and there was evidence that these Appellants were dependent solely upon the efforts of VEI and Morty Vinson as operators, to obtain a profit. Tubb stated that their objective was a low-risk investment with someone to manage it for them. However, there is some evidence that Tubb exercised some control over the operation on various occasions. Anderson discussed with Vinson the need for him to manage their entire operation because of his expertise. Appellants expected Vinson to make the decisions, and they only wanted to be informed. Vinson selected the specific oil and gas lease to purchase, negotiated the terms of the lease, performed a geological study of the property, selected the drillsite, selected the formation to drill down to and oversaw the drilling and completion of the wells. Article V, page 3 of the Operating Agreement between the parties provided that "Vinson Exploration, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations...." Neither Tubb nor Anderson had ever worked in the oil field or for any oil company. Tubb's experience in the oil business was limited to being a passive investor in two prior ventures before investing in the 12–A Lease, although he did have experience in drilling water wells. There was sufficient evidence to raise fact issues in regards to whether a security was involved.

To come within the Texas Securities Act, the transaction in question must have involved a sale. Tex.Rev.Civ.Stat.Ann. art. 581–4 E. It relates to sales and sellers of securities and not purchasers or buyers. *Herren v. Hollingsworth*, 140 Tex. 263, 167 S.W.2d 735, 738 (Tex.1943). Appellees argue that they were agents for Appellants and no "sale" took place between the parties.

The joint operating agreement states that VEI would "procure" leases for the benefit of the Appellants. There is a letter from Morty Vinson to Anderson that states "part of this money is being spent to procure the lease of 160 acres from the Shannon Estate.... I am also looking forward to receiving the operating agreement and assigned lease...." In a letter agreement, there is the language that VEI "will make every effort to work out an acceptable acreage purchase and option arrangement...." It is contended that this indicates that VEI was only an agent and joint venturer with the Appellants.

However, evidence of a sale was also present. Morty Vinson stated that he sold the 12–A Lease prospect to the Appellants. He alone decided to choose the 12–A Lease as a prospect and he independently negotiated the terms of the lease with the lessors. It was Vinson Exploration, Inc. that received the lease from the Shannon Estate. It in turn assigned the interest to Tubbs and Anderson, reserving a right to take back the interest upon certain conditions indicating abandonment by Tubbs and

Anderson. There is sufficient evidence to create a fact issue.

■ There is evidence of misstatements and omissions of material facts, which is necessary to bring action under the Texas Securities Act. Morty Vinson testified that he was aware the Appellants were seeking a "reasonably low risk" investment and not a "rank wildcat". George Hover, a petroleum engineer, characterized the 12–A Lease as a "fairly high risk" investment. Charles Godfrey, a petroleum geologist, concluded the lease had a 75 percent chance not to obtain a commercially productive well based upon historical data.

Three to five miles southwest from the 12–A Lease was the Todd Field and one mile southwest was the Todd North Field. The written prospect given by Vinson to Tubbs and Anderson prior to the purchase, states that "[t]he combined cumulative of the Todd N and Todd San Andres fields as of 3/87 with 45 wells is 1,978,734 BO [barrels of oil] or 44,000 BOPW [barrels of oil per well]." Hover testified that here were actually 56 wells which produced 2,165,300 barrels for a well average of 38,666 barrels, approximately 5,000 barrels per well less than the prospect amount. Todd Field and Todd North Field were not differentiated by the Appellees as to their separate characteristics. The wells in Todd Field averaged 43,000 barrels per well, whereas the wells in the Todd North Field averaged 24,000 barrels. There were five dry wells between the two fields. Appellees estimated that the 12–A Lease should recover average daily production of 40 barrels per day per well. Only 3 of 13 wells in the Todd North Field ever made 40 barrels of oil per well per day and only produced at that rate for two or three years. Hover testified that the Appellees' projection of 40 barrels per well per day was unrealistic.

Hover testified that the Appellees' estimated monthly operating costs at $500 per well was low. VEI omitted charges for electricity, ad valorem taxes, chemicals, water hauling and repair work from the estimated operating expenses. The operating expenses for the first two to four months under VEI's operation ran between $8,000 and $9,000 per month for three wells.

Appellants were not made aware that the closest well offsetting the 12–A Lease was a dry hole. They further were not made aware that the offsetting field to the 12–A Lease had all of its wells plugged and abandoned in 1987. VEI had done the plugging. Appellants wer enot made aware that Appellees had drilled their own dry well in 1986 between the only two good wells in the Todd North Field. Appellees had been rejected by four or five oil companies when they had previously tried to sell the prospect that was sold to the Appellants. Morty Vinson also testified that in all his twenty-five years in the oil business, this was only the second instance in which he had not taken a working interest in the operation. There is sufficient evidence to raise a fact issue on misstatements or omissions of material facts.

■ The Appellees urge the defense of joint adventurers. The Texas Securities Act does not apply if the parties were actually joint adventurers. *Brown v. Cole,* 155 Tex. 624, 291 S.W.2d 704, 708 (Tex. 1956); *Dunbar,* 746 S.W.2d at 314, 315. A joint venture is a defense to any cause of action arising under the Texas Securities Act. *Dunbar,* 746 S.W.2d at 316. *Russell v. French & Associates, Inc.,* 709 S.W.2d 312, 314 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). The four elements of a joint venture are (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *Ayco Development Corporation v. G.E.T. Service Company,* 616 S.W.2d 184, 186 (Tex.1981).

■ There was evidence that the ultimate control of the operation was in the hands of Appellees. The joint operating agreement wholly excluded the Appellants from participation in the drilling, operating and control of the wells in question. Appellees encouraged, but did not contribute to, the initial investment of the project. Appellees were to share in the profits only to the extent of the overriding royalty.

The Appellees contend the joint operating agreement establishes a joint venture as a matter of law. They cite *Dunbar.* We find no language in *Dunbar* suggesting this. We do find language to the contrary in *Ayco Development Corporation,* 616 S.W.2d at 186; *Youngstown Sheet & Tube Co. v. Penn,* 363 S.W.2d 230, 234 (Tex.1963). There is sufficient evidence to create a fact issue in reference to the defense of joint venture. Points of Error Nos. One through Four, Six through Nine, Eleven through Fifteen and Seventeen through Twenty–Three are sustained. Points of Error Nos. Five, Ten and Sixteen relating to the directing of verdict and the failure to submit questions on damages connected with alleged violations of the Texas Securities Act are likewise sustained.

## DECEPTIVE TRADE PRACTICES ACT

Appellants next urge in Points of Error Nos. Twenty–Four through Thirty–Two that the trial court erred in directing a verdict in various respects, including the alleged breach of implied warranties, on their deceptive trade practices cause of action. In Points of Error Nos. Thirty–Three through Forty–One, Appellants contend that the trial court erred in failing to submit their deceptive trade practices claim and certain specifically requested questions relative thereto to the jury.

In order to establish consumer status under the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA), a plaintiff must show (1) that it sought or acquired goods or services by purchase or lease and (2) that the goods or services purchased or leased form the basis of the complaint. *Melody Home Manufacturing Company v. Barnes,* 741 S.W.2d 349, 351–52 (Tex.1987). "Services" is defined as "work, labor, or service purchased or leased for use." Tex.Bus. & Com.Code Ann. § 17.45(2) (Vernon 1987). "For use" has been interpreted to mean "to put or bring into action or service; to employ for or apply to a given purpose." *Beggs v. Texas Department of Mental Health and Mental Retardation,* 496 S.W.2d 252, 254 (Tex.Civ.App.—San Antonio 1973, writ ref'd). "Use" means "to employ for accomplishment of a purpose; to apply to one's service; to avail oneself of." *Otto, Inc. v. Cotton Salvage & Sales, Inc.,* 609 S.W.2d 590, 593 (Tex.Civ.App.—Corpus Christi 1980, writ dism'd); *James Stewart & Co. v. Mobley,* 282 S.W.2d 290, 294 (Tex.Civ.App.—Dallas 1955, writ ref'd).

In their pleadings, Appellants alleged under their DTPA and breach of warranty causes of action that (1) Appellees represented that *services* had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they did not have; (2) Appellees represented that an *agreement* conferred or involved rights, remedies or obligations which it did not have or involve; and (3) Appellees failed to disclose information concerning *goods or services* which were known at the time of the transaction and which failure to disclose was intended to induce them into the transaction when they would not have entered into the transaction if the information had been disclosed. By their requested issues, definitions and instructions, Appellants sought to have the jury charged in accordance with their DTPA cause of action. They also sought to have the jury answer questions relating to whether Appellees breached warranties by selecting an oil and gas lease for Appellants that was not suitable for the purpose and by failing to perform their services in a good and workmanlike manner, and whether Appellees acted unconscionably by either taking advantage of Appellants' lack of knowledge, ability, experience or capacity to a grossly unfair degree or entering into a transaction which resulted in gross disparity between the value received and the consideration paid.

The gist of Appellants' DTPA claim is that Appellees misrepresented the condition of the 12–A Lease and failed to state facts they knew were significant. It follows that all of the "services" of which Appellants are actually complaining concern the alleged deception that occurred in the negotiations surrounding the joint operating agreement and not the drilling opera-

tion on the lease itself. However, if Appellants paid for any "services" at all, it was for the Appellees' duties as an operator, not for rendering allegedly deceptive advice on oil and gas investments, which is the basis of the Appellants' complaint. Considering each of Appellants' DTPA allegations separately, first, there is no evidence that the Appellees failed in their services as operators of the 12–A Lease. Second, there was no evidence that either the letter agreement or the subsequent joint operating agreement conferred or involved any rights, remedies or obligations which it did not have or involve. Finally, there is no evidence to support the allegation that any vital information was excluded which concerned the actual operator services provided by Appellees. In essence, the thrust of Appellants' argument in court and the evidence presented to the court was that the DTPA was violated by the actions of Appellees under the joint operating agreement, but Appellants now contend that the sale of the 12–A Lease itself gave rise to DTPA liability.

An investor under an oil and gas joint operating agreement is not, as a matter of law, a "consumer" of services as contemplated within the DTPA. *C & C Partners v. Sun Exploration and Production Company*, 783 S.W.2d 707, 712–13 (Tex.App.—Dallas 1989, writ denied); *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316, 322 (Tex.App.—El Paso 1982, no writ). Although *C & C Partners* and *Hamilton* dealt specifically with liability for costs incurred by the operator under joint operating agreements rather than with alleged deceptive practices leading up to the signing of the agreement, the reasoning therein is applicable to this case. In *Hamilton*, it was held that since the purpose of operating agreements in the oil and gas industry is to spread the risk of drilling operations among the investors, it should not be construed to create liability under the DTPA. 648 S.W.2d at 322. As in *C & C Partners* and *Hamilton*, the Appellants did not employ the Appellees, but if they did employ Appellees in any capacity, it was for their services in operating the lease, not for services in rendering investment advice. Ap-

pellants' reliance on *Vick v. George*, 671 S.W.2d 541 (Tex.App.—San Antonio 1983), *rev'd on other grounds*, 686 S.W.2d 99 (Tex.1984), is misplaced since the question of the status of the purchasers as "consumers" under the DTPA was not raised or discussed on appeal and the purchasers were not parties to a joint operating agreement. The trial court's directed verdict and refusal to submit questions, definitions and instructions on Appellants' DTPA claims was therefore correct. Points of Error Nos. Twenty–Four through Forty–One are overruled.

## JUSTNESS AND REASONABLENESS OF ACCOUNT

 Under Point of Error No. Forty–Two, Appellants assert error by the trial court in failing to submit a jury question inquiring as to the justness and reasonableness of the charges claimed by VEI against Appellants for goods and services furnished in connection with the four wells. The burden was on VEI to prove by a preponderance of the evidence that the charges in question were reasonable. *Russell v. French & Associates, Inc.*, 709 S.W.2d 312, 318 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). However, apart from Appellants' pleadings, neither the reasonableness nor the necessity of the charges incurred by VEI and billed to Appellants was ever disputed by the latter. All of the evidence in the trial was to the effect that the charges were reasonable. Even though the reasonableness of the charges was put in issue by Appellants' pleadings, the submission of a jury question on reasonableness (or justness) was unnecessary where it was conclusively established by the evidence. *Transit Enterprises, Inc. v. Addicks Tire & Auto Supply, Inc.*, 725 S.W.2d 459, 462 (Tex.App.—Houston [1st Dist.] 1987, no writ).

Furthermore, Appellants were required under the accounting procedure addendum to the joint operating agreement to take written exception to any bills and statements with which they disagreed within twenty-four months after the end of the calendar year in which the disputed bills

and statements were rendered. There is no evidence that this was ever done by Appellants.

Point of Error No. Forty–Two is overruled.

## FAILURE TO PAY AS A DEFENSIVE ISSUE

In their forty-third through forty-fifth points of error, Appellants contend that the trial court erred in failing to submit a question and supporting instructions inquiring whether Appellants' failure to pay the charges invoiced to them was excused by VEI's failure to pay the third parties who had furnished the goods and services in question. They argue that under *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex.1990), a party in default under a contract cannot maintain a suit against the other party for breach of the contract. The *Dobbins* court went on to state that a party who has substantially completed its performance may maintain an action for breach of contract even though it may have breached the contract in some respect. "Substantial performance" means that the essential elements of a contract have been performed and is the legal equivalent to full performance. *Geotech Energy Corporation v. Gulf States Telecommunications and Information Systems, Inc.*, 788 S.W.2d 386 (Tex.App.—Houston [14th Dist.] 1990, no writ); *CraneTex, Inc. v. Precision Crane & Rigging of Houston, Inc.*, 760 S.W.2d 298 (Tex.App.—Texarkana 1988, writ denied).

In this case, Appellees sued on an open account based upon the joint operating agreement. Appellees did not plead performance or substantial performance of the contract on their part nor did they specifically plead breach of contract on the part of Appellants. Appellants answered with a general denial of the open account allegations but did not specifically plead prior breach as a defensive matter (although they did plead breach of contract by Appellees under their counterclaims). While a general denial puts into issue all matters pled by the adverse party which are not required to be denied under oath, Tex.

R.Civ.P. 92, it does not raise a defensive issue of excused performance such as that offered by Appellants in this case. Tex. R.Civ.P. 278. As Rule 278 (formerly Rule 279) makes abundantly clear, in this situation, a party is not entitled to the submission of a question which was at best raised only by general denial but not by affirmative pleadings, even though the issue may have been tried by consent. *McFadden v. Hale*, 615 S.W.2d 345, 348 (Tex.Civ.App.—Waco 1981, no writ). Had the Appellants pled prior breach by Appellees as an excuse for their nonperformance, the burden would then have been on Appellees to plead, prove and submit a question on substantial performance. This was not done. Points of Error Nos. Forty–Three through Forty–Five are accordingly overruled.

## 12–B LEASE SET–OFF ARGUMENT

Under Point of Error No. Forty–Six, Appellants assert that the trial court erred in prohibiting counsel for Appellants from mentioning in final argument that VEI's failure to convey the 12–B Lease to Tubb should be considered as a set-off against VEI's claim.

Appellants pled as a defensive matter that Tubb was entitled to a set-off for the amount he had paid to VEI for the 12–B Lease. Evidence concerning the amount paid by Tubb to VEI ($35,000) and paid by VEI to the lessors ($30,192.07) was offered by both parties without objection. The evidence was uncontroverted that despite receiving from Tubb the above payment, VEI failed and refused to assign the 12–B Lease to Tubb because of the amount VEI claimed Tubb owed on the account. There was also evidence that Tubb, after paying the above amount, asked for and received a VEI check in the amount of $9,200 to pay for some pipe he had purchased for use on the 12–A Lease. Whatever rights the parties had in the 12–A Lease and the 12–B Lease arose from the same letter agreement of November 6, 1987.

The object of set-off is to adjust the demands between the parties and allow a recovery of only the balance that is due. *CPS International, Inc. v. Harris & West-*

*moreland,* 784 S.W.2d 538, 544 (Tex.App.— Texarkana 1990, no writ). Both demands must mutually exist between the same parties in order for one demand to be set off against another. *Dallas/Fort Worth Airport Bank v. Dallas Bank & Trust Company,* 667 S.W.2d 572, 575 (Tex.App.—Dallas 1984, no writ). In this case, the claims of indebtedness involved the same parties and although the claims were connected with different leases, they arose from the same general agreements and as the testimony made clear, were intertwined with the dispute between the parties. We hold that the claim of Tubb for a credit of the amount he had paid VEI for the 12–B Lease assignment was a proper set-off against the amounts claimed by VEI against Tubb on the 12–A Lease. As a result of this holding, Appellants' counsel should have been permitted to argue the evidence on the subject to the jury.

■ Counsel should be allowed wide latitude in arguing the evidence and reasonable inferences to the jury. *Dyer v. Hardin,* 323 S.W.2d 119, 127 (Tex.Civ. App.—Amarillo 1959, writ ref'd n.r.e.); Tex.R.Civ.P. 269. However, control of counsel during the trial rests within the sound discretion of the trial court and a reviewing court will not interfere unless it is clear that the trial court abused its discretion. *Mandril v. Kasishke,* 620 S.W.2d 238, 247 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). In this situation, the appellate court must review the trial court's action to see if that court acted without reference to any guiding rules and principles. *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 298 (Tex. 1986). Since we have previously concluded that the amount claimed by Tubb against VEI was a proper subject for set-off, it was error for the trial court to prohibit Appellants' counsel from arguing that concept to the jury.

As in the case of improper jury argument, reversal is required only if this Court is satisfied that the action of the trial court in restricting jury argument was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Harrison v. Harrison,* 597 S.W.2d 477, 487

(Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). Based on Morty Vinson's own testimony, as well as Tubb's, that Tubb had paid $35,000 for the 12–B Lease but that he (Vinson) was unwilling to assign that lease until Tubb paid the deficiency resulting from the $9,200 check for pipe, it is apparent that the jury could well have offset the amount owed to VEI by the amount owed to Tubb if Appellants' counsel had been permitted to argue set-off. We sustain the forty-sixth point of error.

### CROSS–POINTS ON BREACH OF GOOD FAITH DUTY

■ In three conditional cross-points of error, Appellees contend that the trial court erred by refusing to submit requested jury questions relating to an alleged breach of the duty of good faith and fair dealing by Appellants and by directing a verdict against them on that cause of action. Appellees argue that they were entitled to a submission on the question of breach of the duty and the question of punitive damages resulting therefrom because of the special relationship that they argue existed between the parties as joint venturers. *English v. Fischer,* 660 S.W.2d 521, 522 (Tex. 1983). It is only in very limited circumstances that a contractual relationship between the parties creates a good faith, fiduciary duty. *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984). However, we need not reach the question of whether the trial court erred by such refusal for the reason that error, if any, was not preserved.

Rule 276 of the Texas Rules of Civil Procedure provides:

When an instruction, question, or definition is requested and the provisions of the law have been complied with and *the trial judge refuses the same, the judge shall endorse thereon "Refused," and sign the same officially.* ... Such refused ... instruction, question, or definition, when so endorsed shall constitute a bill of exceptions, and it shall be conclusively presumed that the party asking the same presented it at the proper time, excepted to its refusal ... and that all the requirements of law have been ob-

served, and such procedure shall entitle the party requesting the same to have the action of the trial judge thereon reviewed without preparing a formal bill of exceptions. [Emphasis added].

Although Appellees filed their two requested questions relating to breach of the good faith duty and punitive damages, the record shows that they were never endorsed or signed in any manner by the judge nor did he even acknowledge receiving them. In their objections to the charge, Appellees made only a brief reference to the fact that they had submitted the two questions. Where the record fails to show that the requested questions were presented and refused by the trial court, either by a proper endorsement and signature or by a formal bill of exceptions, no error is shown even though the requested questions are included in the transcript. *Moffett v. Goodyear Tire & Rubber Co.,* 652 S.W.2d 609, 612 (Tex.App.—Austin 1983, writ ref'd n.r.e.). Appellees' cross-points are overruled.

Having sustained Points of Error Nos. One through Twenty–Three pertaining to Appellants' Texas Securities Act cause of action, we reverse the judgment of the trial court and remand for a new trial on that cause. Also, having sustained Point of Error No. Forty–Six which pertained to Appellant, T.C. Tubb, and his argument for set-off, it is necessary for us to reverse and remand for new trial the remainder of the judgment since the attorneys' fees found by the jury and the costs were adjudged against Tubb and Anderson jointly and severally. Having overruled Points of Error Nos. Twenty–Four through Forty–Five and Appellees' cross-points, the actions of the trial court in those respects are affirmed.

WOODARD, J., not participating.