# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

## No. 92-4274
_____

**CALPETCO 1981, a Limited Partnership, ET AL.,**

                                    **Plaintiffs-Appellants,**

**VERSUS**

**MARSHALL EXPLORATION, INC., ET AL.,**

                                    **Defendants-Appellees.**

_____

**Appeal from the United States District Court
for the Eastern District of Texas**

_____

April 26, 1993

Before WILLIAMS, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

The instant dispute between the non-operator and operator in a series of oil and gas drilling ventures turns for the most part on the burdens of proof and standard for summary judgment. Also in issue are bench trial findings of fact. We **AFFIRM**.

                                    I.

James Michael began oil and gas investments for himself and his law partners in 1967. He developed a structure for the investments, whereby he would form a business entity to serve as the general partner in a series of limited partnerships, with the investors as the limited partners. Those partnerships, some

bearing the name "Calpetco" (the prior Calpetco entities), invested with numerous oil and gas operators.

In 1979, Michael met Quinton Carlile, President and CEO of Marshall Exploration, Inc.; and, after some discussion, the prior Calpetco entities began investing with Marshall. These investments were quite successful, and continued until 1981. That year, Michael incorporated Calpetco Enterprises, which was wholly owned by him. Calpetco Enterprises and Michael became the general partners in a series of limited partnerships (the Calpetco partnerships) formed to invest in the drilling, development, and operation of oil and gas wells. It was Michael's intention that a major portion of the partnership funds would be invested with Marshall, and he again engaged in discussions with Carlile regarding Marshall's drilling program and billing practices.

In June 1981, Marshall and Calpetco 1981 (one of five Calpetco partnerships in this litigation) entered into an operating agreement, which was to be read in conjunction with investment-specific letter agreements to govern the drilling, completion, and production of each well or group of wells. Exhibit "C" to the Operating Agreement is standard accounting procedures,[1] which provide that Calpetco may pay charges from Marshall without prejudice to its right to later contest their validity. However, all bills and statements issued in the course of a calendar year are "conclusively ... presumed to be true and correct" 24 months

---

[1] The procedures are virtually identical to those promulgated by the Council of Petroleum Accountants Societies, and are standard in the oil and gas industry.

after the end of the calendar year in which they were rendered unless, within those 24 months, the non-operator (Calpetco) "takes written exception thereto and makes claim on Operator [Marshall] for adjustment".

The accounting procedures also allowed Calpetco to audit Marshall's accounts and records within the 24-month adjustment period. Audits were to be conducted at Calpetco's expense, and did not extend the time for filing written exceptions and demands for adjustment. In case of conflict between the terms of any of these documents, the Operating Agreement controlled the accounting procedures, and both were controlled by the applicable letter agreement.

The Calpetco partnerships entered into 73 letter agreements with Marshall, representing investment in 55 wells. Some of these wells enjoyed less success than Michael's earlier investments with Marshall; and in September 1982, Michael began to express his concerns to Carlile. Michael (also a party to this litigation, *see* note 2 *infra*) contends that, by early 1985, he began to seriously question representations Marshall had made to him between 1981 and 1984, which he contends induced his participation in the various ventures. That April, he began to review certain charges and request documentation from Marshall. Extensive communication continued for almost two years, with Calpetco asserting overcharges by Marshall, and Marshall asserting that some of the Calpetco partnerships had not paid amounts due. Marshall did conduct at

least a partial review of the Calpetco accounts and some adjustments were made.

After unsuccessful attempts at settlement, Marshall filed this action in April 1987 against five Calpetco partnerships,[2] seeking, *inter alia*, a declaration that charges questioned by Calpetco were conclusively presumed correct. Calpetco responded with 16 counterclaims[3] against Marshall and five additional third party defendants,[4] based primarily on alleged misrepresentations and overcharges.

Following more than three years of extensive discovery, Marshall moved for partial summary judgment in January 1991, on the grounds that many of Calpetco's claims were barred by either the contractual 24-month adjustment period or the Texas four year statute of limitations for breach of contract claims. In response,

---

[2]     In June 1989, all of the Calpetco partnerships, represented by retained counsel, transferred their interest in this litigation to Michael, who thereafter proceeded *pro se*. We continue to refer to the appellants as "Calpetco".

[3]     Included were claims for breach of contract, rescission, intentional and negligent misrepresentation, fraud, negligence, gross negligence, and breach of fiduciary duty. Statutory claims included the Securities Act of 1933, Securities Exchange Act of 1934, RICO, Texas Deceptive Trade Practices Act (DTPA), California Unfair Practices Act, Texas Blue Sky Law ("The Securities Act"), California Corporate Securities Law, and Louisiana Securities Law.

[4]     Third party defendants included Martex Drilling Co., which performs Marshall's drilling, completion, and production operations; Carlile & Howell, Inc., which handles Marshall's financial and accounting services; H & C Well Service, Inc., which conducts Marshall's site preparation; Quinton B. Carlile, President and CEO of Carlile and Howell, Inc., Marshall, and Martex, and Vice President of H & C ; and Carlile's partner, T.D. Howell, President of H & C and Vice President of the other three entities. All of the counter-defendants are referred to as "Marshall".

Calpetco contended that (1) the contractual and statutory limitation periods should be tolled because Marshall had fraudulently concealed its overcharges, preventing Calpetco from discovering its claims in a timely manner; (2) there were genuine issues of material fact on whether Marshall waived, or was estopped from asserting, the 24-month limitation; and (3) in any event, the accounting procedures did not apply to costs incurred before a well reached contract depth. A conclusory affidavit by Michael was filed with the response.[5] After a hearing at the end of February,[6] the district court granted the motion in mid-March 1991, concluding that the accounting procedures were "clear and unambiguous" and governed "the procedures for charges and credits for the entire project", and that Calpetco failed to produce sufficient evidence to show a genuine issue of material fact on its claims of fraudulent concealment, waiver and estoppel.

In April 1991, Calpetco moved for reconsideration or clarification, or in the alternative, certification for interlocutory appeal. In support, it submitted a second affidavit by Michael, with 37 attachments, chronicling the 1982 through 1987

---

[5]     Calpetco also submitted the affidavit of Robert P. Malone, an auditor of oil and gas operations. Malone, an active member of the Council of Petroleum Accountants Societies, helped write a later version of the accounting procedures. He stated that the 24-month limitation period was never intended as "an outright bar against protests and objections after the expiration of the 24-month period".

[6]     At the hearing, the court also heard, and later denied, Marshall's second motion for partial summary judgment, which asserted that it did not owe Calpetco a fiduciary duty and that Calpetco was not a DTPA consumer.

correspondence between Marshall and Calpetco. Shortly thereafter, Marshall filed a fourth motion for partial summary judgment,[7] seeking rulings (1) that Calpetco did not timely object to any of the challenged charges (alleged overcharges), and (2) that therefore, all are "conclusively presumed true and correct", and at trial, Calpetco could not challenge those charges for any purpose. Because the court considered both motions "really ... one in the same", they were heard together. Marshall's was granted; Calpetco's, denied.

All remaining claims (including negligence, gross negligence, and over 30 alleged misrepresentations[8]) were heard in a four-day bench trial in December 1991. In accordance with the partial summary judgment on the fourth motion, the court excluded all evidence of overcharges. At the close of Calpetco's (the plaintiff's) case,[9] and on motion by Marshall, the court, pursuant to newly-amended Fed. R. Civ. P. 52(c), made a series of findings and ruled against Calpetco on several of its claims.[10] Following

---

[7]    The third motion, filed in February 1991, was not contested. The district court ruled that Texas law would govern all claims, except those brought under federal law, and granted judgment against Calpetco's claims under Louisiana and California law.

[8]    These alleged misrepresentations formed the basis of Calpetco's remaining claims of intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, and fraud, as well as violations of the 1933 and 1934 Federal Securities Acts, RICO, and the Texas Blue Sky Law and DTPA.

[9]    The court had realigned the parties.

[10]   It ruled that Calpetco had failed to establish a RICO violation or the existence of a fiduciary relationship, and disposed of some, but not all, of the alleged misrepresentations. The court also noted that Calpetco had conceded that its federal

6

trial, and pursuant to findings of fact and conclusions of law, the court ruled against Calpetco on all remaining claims.[11]

                                    II.

Calpetco raises numerous points of error, including the partial summary judgments, denial of its motion for reconsideration, and rulings on several of its Texas DTPA and Securities Act claims.

                                    A.

In challenging the first partial summary judgment, Calpetco asserts, *inter alia*, error in the district court's interpretation of the contractual language, and its refusal to toll the 24-month adjustment period and statute of limitations on the basis of fraudulent concealment, or bar reliance on the accounting procedures under the doctrines of waiver or estoppel.[12]  Of course, we review a summary judgment *de novo*, applying the same standard used by the district court.  *E.g.*, **Skotak v. Tenneco Resins, Inc.**,

---

securities claims were time-barred.

[11]     The court held that Marshall was not negligent or grossly negligent in drilling or completing any of the wells, that Marshall had not made negligent, intentional, or fraudulent misrepresentations to Calpetco, and that Calpetco had failed to establish its claims of fraud or violation of the Texas Blue Sky Law or DTPA.

[12]     Calpetco also challenges the district court's conclusion that the four year statute of limitations for breach of contract actions began to run when the payment of each invoice became due.  But, in granting the fourth motion for partial summary judgment, the court disposed of Calpetco's breach of contract claim solely on the basis that no written objection was filed within the contractual adjustment period.  Because none of Calpetco's claims were ultimately held barred by the statute of limitations, and because we agree with the adjustment period ruling, we need not reach this issue.

953 F.2d 909 (5th Cir.), *cert. denied*, __ U.S. __, 113 S.Ct. 98 (1992).

1.

The agreement between Calpetco and Marshall consists of two documents:  the letter agreement for each investment and the Operating Agreement (with its accounting procedures), adopted by each letter agreement.  As with any set of documents executed at the same time, with the same purpose and in the course of the same transaction, we construe the agreements together.  ***Jim Walter Homes, Inc. v. Schuenemann***, 668 S.W.2d 324, 327 (Tex. 1984).  In doing so, we find no ambiguity, and agree with the district court's ruling that the accounting procedures "govern the procedures for charges and credits for the entire project".

Calpetco contends that, under the controlling letter agreement, the Operating Agreement applies only after each well is drilled to contract depth, and therefore, any invoices submitted for costs incurred in the drilling phase are not governed by the accounting procedures.  This interpretation is reasonable, Calpetco says, because in most cases the drilling costs were turnkeyed[13] and, in others, the letter agreements explain the costs to contract depth.  Thus, there is no need for an accounting procedure at the drilling stage.

---

[13]    Under the turnkey arrangement, Calpetco paid Marshall a fixed price to drill a test well to a particular contract depth.  Once a well reached "casing point", or contract depth, a decision was made to either complete or abandon it.

8

The letter agreement language on which Calpetco relies states, however, that the Operating Agreement "shall govern *operations* on the Subject Leases after the test well has been drilled to contract depth". (Emphasis added.) This is distinctly different from stating that it does not even take effect until that time. To the contrary, it is clear that the Operating Agreement is applicable from the time each letter agreement is signed. The Operating Agreement states that it "shall be retroactive to date of first operations, including drilling and first production". The accounting procedures specifically address billing for overhead at the drilling stage. Under Calpetco's interpretation, this provision would be rendered completely meaningless, in defiance of a basic rule of contract interpretation -- every clause is intended to have some effect. **Westwind Exploration, Inc. v. Homestate Sav. Ass'n**, 696 S.W.2d 378 (Tex. 1985).

Needless to say, interpretation of an unambiguous contract is a question of law. *E.g.*, **Technical Consultant Services, Inc. v. Lakewood Pipe**, 861 F.2d 1357 (5th Cir. 1988). As stated, we reach the same conclusion as did the district court, and hold that the accounting procedures, with their 24-month adjustment period, governed all billing and payment between Marshall and Calpetco throughout their drilling ventures. Therefore, we turn to whether the application of that adjustment period is foreclosed by fraudulent concealment, waiver, or estoppel.

2.

Summary judgment was appropriately granted against the fraudulent concealment, waiver, and estoppel claims if the record as of the ruling[14] revealed no genuine issue of material fact, and if Marshall was entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  We look to the applicable substantive law to determine what facts are material, *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir. 1990), and then decide whether there are any *genuine* disputes about those facts.  Mere disagreement is not enough; a dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party".  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  This analysis also requires close attention to the burden of proof.  Of course, the movant bears the initial burden of showing the district court the absence of a genuine issue of material fact.  Once the movant does so, and if the issue is one for which the nonmovant bears the burden of proof at trial, the nonmovant must then "go beyond the pleadings and ... designate `specific facts showing that there is a genuine issue for trial'".  *Celotex Corp. v. Catrett*, 477 U.S. 316, 324 (1986).[15]

---

[14]    For example, as discussed in note 15, *infra*, Michael contended that he need not support his opposition to summary judgment with documents he knew to be in Marshall's possession.  The district court correctly instructed: "Well, Mr. Michael, I'll say this:  If you're relying on a document for purposes of summary judgement [sic] evidence, in order for the Court to rely on it, I've got to have it in the record and not in opposing counsel's file."

[15]    At the joint hearing in February 1991 on the first and second motions for partial summary judgment, Michael was steadfast in his position that Marshall had the "absolute burden of proof" to show

10

To establish fraudulent concealment, Calpetco has the burden of proving that (1) Marshall had actual knowledge of the facts it allegedly concealed (the overcharges), and (2) it was Marshall's "fixed purpose" to conceal them. *See **Dotson v. Alamo Funeral Home***, 577 S.W.2d 308, 311-12 (Tex. Civ. App.--San Antonio 1979, no writ). Thus, once Marshall pointed to the absence of a factual issue for trial, Calpetco was obligated to point to specific evidence showing such an issue. ***Celotex***, 477 U.S. at 324. All Calpetco could point to were conclusory statements in Michael's affidavit (filed in response to the motion) that Marshall "employed delaying tactics" in response to Calpetco's requests for information, and "actively misled Calpetco ... [and] effectively precluded Calpetco from

---

the absence of a genuine issue of material fact. When the court pointed out that Michael's position did not "quite conform[]" to the federal standard as set forth in the Supreme Court's trilogy, ***Anderson v. Liberty Lobby***, 477 U.S. 242 (1986); ***Celotex Corp. v. Catrett***, 477 U.S. 317 (1986); ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, 475 U.S. 574 (1986), he retorted, "Well, that's the law in Texas, Your Honor." Perhaps this misunderstanding of the federal summary judgment standard explains Michael's failure to submit documentation to support his conclusory affidavit filed with the initial opposition to Marshall's first motion for partial summary judgment.

In any event, it seems that, on the morning of the hearing on the first summary judgment motion, Michael attempted to offer documentation to support his affidavit filed three weeks earlier. (Five days before the hearing, Marshall filed a motion to strike Calpetco's affidavits, in part because Michael's was conclusory.) When Marshall objected to this belated submission, Michael explained that he did not submit the documents earlier, because he knew they were in Marshall's file. Michael apparently saw no need to reveal the documents to Marshall, but as noted *supra*, the court explained, "If you're relying on a document for purposes of summary judgement [sic] evidence, in order for the Court to rely on it, I've got to have it in the record and not in opposing counsel's file."

discovering in a timely manner the invalidity of the charges and overcharges". But, no documents or other proof evidencing those "delaying tactics" were submitted. Likewise, the statement as to Marshall's intent or purpose to "actively mislead" came not from one who might have knowledge of such purpose, but from the opposing party, Michael. In sum, this is not evidence which could cause "a reasonable jury [to] return a verdict for [Calpetco]". *Liberty Lobby*, 477 U.S. at 246.

### b.

Calpetco also failed to point to genuine issues of material fact regarding Marshall's alleged waiver of its right to assert the 24-month limitation or its being estopped from doing so (discussed *infra*). Waiver requires evidence that (1) Marshall was aware of its right to assert the contractual limitation period, and (2) expressly relinquished it or acted in a manner inconsistent with it. *See* **Alford, Meroney & Co. v. Rowe**, 619 S.W.2d 210, 213-14 (Tex. Civ. App.--Amarillo 1981, writ ref'd n.r.e.).

First, there is no evidence that Marshall expressly relinquished its right to assert the limitations period.

Second, and in any event, Calpetco apparently contends that Marshall acted in a manner inconsistent with that right, by entering into negotiations and making some adjustments in Calpetco's account;[16] but, we do not agree. The accounting

---

[16]    In its brief opposing the first summary judgment motion, Calpetco contended that these negotiations resulted in adjustments to charges rendered more than 24 months before. Thus, because Marshall did not assert the 24-month adjustment period as a bar to such negotiation, it could not assert that bar in the future. The

procedure states that the time for making written exception is not extended by commencing an audit. It is clear that a non-operator (Calpetco) who questions the accuracy of charges cannot hold its right to file a written exception in abeyance while awaiting the outcome of an audit. Likewise, Calpetco had no reason to believe that it need not act within the 24-month period while awaiting the outcome of negotiations. Marshall's attempts to reach agreement with Calpetco cannot, as a matter of law, be interpreted as an act inconsistent with its right to hold Calpetco to the contractual limitations period in the event those attempts failed.

c.

Finally, to establish equitable estoppel, Calpetco is required to show that Marshall's actions induced it to refrain from making a claim for adjustment within the 24-month period. *Gibbs v. Main Bank*, 666 S.W.2d 554, 558-59 (Tex.App.--Houston [1st Dist.] 1984, no writ). For the reasons just noted, we hold that no genuine factual issue on this matter was presented to the district court.

B.

Calpetco next challenges the district court's denial of its motion to reconsider the first partial summary judgment. Because a partial summary judgment is interlocutory in nature, the district court retains the discretion to revise it; and we review only for

---

district court did not reach the merits of that legal position, however, and we, too, decline to do so. Other than Michael's conclusory affidavit, there was no evidence before the district court which would tend to prove that such post-24 month adjustments were, in fact, made.

13

abuse of that discretion. *See* **Avondale Shipyards, Inc. v. Insured Lloyd's**, 786 F.2d 1265, 1269 (5th Cir. 1986). We find none.

The motion to reconsider was filed approximately two weeks after the first partial summary judgment. It challenged the district court's application of the summary judgment standard; but, it did not point to genuine issues of material fact in the record as it existed when the court rendered the judgment. Instead, as noted, Calpetco submitted, for the first time, 37 documents evidencing communication between Marshall and Calpetco about various charges and billing practices. Calpetco offered no explanation for its failure to earlier (timely) submit the documents in opposition to Marshall's first motion. At the hearing, the district court found Calpetco's argument "very persuasive", but stated that Calpetco "had a fair opportunity to present to this Court summary judgment evidence that would have demonstrated that there was a material fact issue for trial on the question of fraudulent concealment ... and the Court has considered the evidence and has ruled on that issue. I am not persuaded by the arguments in the Motion for Reconsideration". The court did not consider the newly offered documents to determine whether they raised a triable fact issue on the points covered by the first partial summary judgment. (As discussed *infra*, the district court did, however, consider the documents in ruling on Marshall's fourth partial summary judgment motion.)

As stated, although we gave plenary consideration to the initial partial summary judgment, we review the court's refusal to

14

reconsider that judgment only for abuse of discretion. Whether we would consider the new documents -- or whether we would find they show a genuine issue of material fact -- is not the inquiry. Rather, on this record, we consider whether the district court was required to reconsider a summary judgment simply because Calpetco belatedly came forward with evidence not submitted prior to the ruling.

The answer must be no. Otherwise, the cycle of reconsideration would be never-ending. Seven years have passed since the famous Supreme Court trilogy[17] breathed life into the use of summary judgment. It has an important, and ever increasing, role in stemming the tide of explosive litigation, greatly congested dockets, increasing delay in claims being adjudicated, and spiraling -- indeed, unimaginable -- litigation costs. In short, it is one of the primary weapons in the Federal Rules of Civil Procedure arsenal, all of which are to "be construed to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1.

Summary judgment, pursuant to the simple procedures established by Rule 56, serves, among other ways, to root out, narrow, and focus the issues, if not resolve them completely. Where, as here, partial summary judgment is granted, the length and complexity of trial on the remaining issues are lessened, all to the advantage of the litigants, the courts, those waiting in line

---

[17] *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 316 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). *See* note 15, *supra*.

for trial, and the American public in general. These are interests of great import, and if they are to be served, the Rules designed to sponsor and secure them must be followed and enforced. In short, a district judge must have considerable discretion in determining when enough is enough. The district court did not abuse that discretion.

## C.

The accounting procedures bound Calpetco to the validity of all of Marshall's charges unless it had "take[n] written exception thereto and ma[de] claim on [Marshall] for adjustment ... within the ... [24-month] period". In its fourth motion for partial summary judgment, Marshall sought (1) a determination that the Waterman audit report, not completed until February 15, 1991 (two weeks before the first summary judgment hearing), constituted Calpetco's first written exception and claim for adjustment, and, therefore, all charges at issue in the case were conclusively presumed true and correct, and (2) a ruling that no evidence of overcharges would be admissible at trial for any purpose. Calpetco challenges the partial summary judgment on both issues.

## 1.

The record before the district court in considering the fourth motion consisted of at least five volumes of pleadings and other papers, affidavits, and exhibits, including the documentation Calpetco submitted with its earlier motion to reconsider.[18] In its

---

[18] For example, the earlier referenced Waterman audit report is one of the 37 documents submitted by Calpetco in support of that motion.

16

motion, Marshall carried its burden of "identifying those portions of [the record] which it believe[d] demonstrate[d] the absence of a genuine issue of material fact". *Celotex*, 477 U.S. at 323. Marshall specifically referenced a letter written by Michael in which he identified April 17, 1987 (the date he claims Calpetco filed its counterclaims[19]), as the date of the first written exception and claim for adjustment. Marshall correctly pointed out that those counterclaims could not, as a matter of law, constitute a written claim for adjustment: they do not point to specific charges or specific invoices. In fact, they do not even specify which partnerships or wells were saddled with the alleged overcharges.

Because Calpetco would bear the ultimate burden of proving which alleged overcharges were timely and properly challenged, it then was required to "go beyond the pleadings and ... designate `specific facts showing that there is a genuine issue for trial'". *Id*. at 324. Calpetco failed to meet this burden, and we conclude that Marshall's fourth motion for partial summary judgment was properly granted.

In its opposition to the fourth summary judgment motion, Calpetco contended that the "two year history of ... claims" submitted with its motion to reconsider evidenced the series of

---

[19]   Calpetco's counterclaims were not filed until May 20, 1987. However, this difference of one month would not affect the invoices which would otherwise be protected by Calpetco's objection. The 24-month adjustment period runs from the end of the calendar year in which the bill was issued. Thus, an objection made anytime in 1987 would be effective as to any charges in issue rendered on or after January 1, 1985.

what it labelled "pre-complaint" (April 1987) claims for adjustment.[20] It re-asserted its previously rejected position on fraudulent concealment as an explanation for its failure to timely make all "post-complaint" claims. At the hearing, Calpetco again stated: "We don't have to rely on the counter-claim. We had two years of negotiations with Marshall with written documentation going back and forth". The lengthy communications to which Calpetco refers certainly convey discontent with Marshall's billing practices. But, they lack sufficient specificity to constitute the requisite exceptions and claims for adjustment. Moreover, Calpetco's reference to them in its summary judgment brief and its argument before the district court is a far cry from the *designation* of specific facts contemplated by Rule 56(e), the **Celotex** Court, and this court, *see* **Nissho-Iwai American Corp. v. Kline**, 845 F.2d 1300, 1307 (5th Cir. 1988).

### 2.

In granting the fourth partial summary judgment motion, the district court held that all charges at issue in the case were conclusively presumed true and correct. It seems self-evident that a fact which is "conclusively ... presumed to be true and correct" is "true and correct" for all purposes. Calpetco contends, however, that in rendering the first partial summary judgment, the district court presumed the accuracy of Marshall's charges only for

---

[20] This is an about face from the position taken by Michael only three weeks earlier, when he indicated in the earlier referenced letter to Marshall, that Calpetco's original counterclaim constituted its written exception and claim for adjustment.

18

purposes of Calpetco's breach of contract counterclaim. In rendering partial summary judgment on the fourth motion, the district court, of course, applied the earlier judgment on the first motion and reached a contrary result to that urged by Calpetco. Calpetco asserts error in this application, offering little legal support,[21] but rather by noting the devastating effect the presumption had on its case. We look, instead, to Rule 56(d), which squarely dictates the result reached by the district court. The Rule provides that when some facts are preliminarily determined by virtue of partial summary judgment, "[u]pon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly". The validity of Marshall's charges were deemed established, and the district court properly excluded any evidence to the contrary.

D.

Finally, Calpetco challenges the district court's bench trial rulings on several of its Texas DTPA and Securities Act claims. Calpetco alleged that several statements or representations made by Marshall violated §§ 17.50 and 17.46(b)(5) or (7) of the Texas DTPA and Art. 581-33.A.(2) of the Texas Securities Act. Calpetco

---

[21] The offered legal support is in the form of a policy argument against waiver of Texas DTPA and Securities Act claims. Calpetco asserts that the accounting procedures amount to an invalid waiver of its right to bring claims under those statutes. To the contrary, the accounting procedures resulted in Calpetco's inability to offer proof of certain facts, i.e., the alleged overcharges. However, the district court made it quite clear that Calpetco could, for example, offer certain invoices "for [the] limited purpose" of establishing Marshall's profit, but not to establish that Calpetco was overcharged.

asserts that the district court erroneously applied the common law fraud standard to these statutory claims. However, we interpret the district court's disposition of each of the alleged deceptive statements as a finding of fact. Finding no clear error, we affirm as to each.

1.

Section 17.50 of the DTPA provides that a "consumer[22] may maintain an action where [the use or employment by any person of a false, misleading or deceptive act or practice] constitute[s] a producing cause of actual damages". "[F]alse, misleading, or deceptive acts or practices" are enumerated in § 17.46(b), and include:

> (5) representing that goods or services have ... characteristics, ingredients, uses, benefits, or quantities which they do not have ....

> * * *

> (7) representing that goods or services are of a particular standard, quality, or grade, ... if they are of another.

Tex. Bus. & Com. Code Ann. §§ 17.46(b)(5), (7) (1987).

a.

Marshall's promotional materials stated that its drilling program concentrated on "development wells" and did not include

---

[22]   Despite the prior holding of this court, *MBank Forth Worth v. Trans Meridian, Inc.*, 820 F.2d 716 (5th Cir. 1987), recent decisions of the Texas courts of appeal indicate that Calpetco may not qualify as a "consumer" under the DTPA. *See Johnston v. American Cometra, Inc.*, 837 S.W.2d 711 (Tex. App.--Austin 1992, writ denied); *Anderson v. Vinson Exploration, Inc.*, 832 S.W.2d 657 (Tex. App.--El Paso 1992, writ denied). However, for our analysis, we assume, without deciding, that Calpetco is a DTPA consumer.

20

highly speculative "wildcat wells". Calpetco's only evidence to the contrary was a regulatory form in which Marshall designated some wells as "wildcat", yet Michael's own testimony established that the form required such a designation for many wells which Michael himself would not call "wildcat". Therefore, the district court did not err in finding, in essence, that the record would not support the contention that this was a false statement.

b.

Next, Calpetco contends that Marshall represented that 75% to 90% of the wells would be completed as "successful, commercially productive wells". This is an apparent reference to the statement in Marshall's brochure that its management and organization "have yielded annual percentages of successful wells var[y]ing from seventy-five to ninety percent". The next sentence in the brochure, however, points out that "these reasons are no guarantees of reward". Thus, contrary to Calpetco's contention, the court's determination that this statement was not "false when made" was not an erroneous application of the common law fraud standard to the statutory claim. It was, rather, a finding that the statement was not a representation about the quantity of goods, but was, instead, an accurate description of past performance, complete with a warning that similar success could not be guaranteed for the future.

c.

Calpetco also asserts that it was assured a three-to-one or four-to-one return on its investment with Marshall. This alleged

21

assurance seems to be taken from a 1983 letter from Carlile to Michael, which explained Marshall's internal procedure for choosing drilling prospects:  only wells with the *prospect* of a return of at least "$3.00 for each $1.00 invested" would be drilled.  Again, the warning:  "but there can never be any guarantees as to the performance of a well or wells".  The district court held, "[b]ased upon the credible evidence", that no such guarantee was made.  Again, Calpetco contends that an erroneous legal standard was applied.[23]  However, we read the district court's opinion as a finding that the alleged misrepresentation of guaranteed returns was not made.  The finding is not clearly erroneous.

d.

Calpetco also contends that Marshall deceptively represented that its wells would have average productive lives of 10 to 20 years.  In dismissing this claim, the district court found that Michael was a sophisticated investor and stated that "a sophisticated investor should not be able to rely on somebody telling them how long an oil well is going to produce, if it does produce".  Given Michael's testimony about his experience in the oil and gas industry, that finding cannot be clearly erroneous.  Thus, the district court's statement regarding reliance is

---

[23]    In its brief to this court, Calpetco contends that it never claimed that Marshall guaranteed such a return, only that such a return could be expected.  Michael so testified at trial; but in its answers to interrogatories, made a part of the record through Marshall's trial brief, and obviously relied upon by the district court, Calpetco represented that it was "assured a three-for-one return on investments with ... the good possibility of four-for-one returns."  In any event, we consider Calpetco's distinction to be one without a difference.

22

essentially a determination that the statement, if made, could not have been a requisite DTPA § 17.50 "producing cause" of any damage suffered by Calpetco. *See* Texas Bus. & Com. Code Ann. § 17.50(a). We agree.

e.

Finally, Calpetco asserts that Marshall represented that it would not make a profit on certain aspects of the drilling venture. The district court found that no such representation was made, and, indeed, pointed to evidence that Calpetco knew about Marshall's profits. Our review of the record reveals no evidence of this alleged representation, but rather confirms the district court's position that Calpetco had actual knowledge of Marshall's profits.

In sum, it has been noted that the objective of DTPA §§ 17.46(b)(5) and (7) "is to ensure that descriptions of goods or services offered for sale are accurate". *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980). We see no clear error in the district court's findings. Therefore, Calpetco's DTPA claims were properly dismissed.

2.

Calpetco bases its Texas Securities Act claim on the alleged misrepresentations discussed above. Article 581-33A.(2) states that the seller of a security is liable to the purchaser if he "offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances

23

under which they are made, not misleading".  Tex. Rev. Civ. Stat. Ann. art. 581-33A.(2) (Supp. 1993).

We have already concluded that the district court found that the alleged statements were either not made, or not untrue, and have held that those findings are not clearly erroneous.  Calpetco could not have shown, then, that securities were sold "by means of an untrue statement".[24]  Its claims under the Texas Securities Act were likewise properly dismissed.

### III.

Accordingly, the judgment is

**AFFIRMED.**

---

[24]    As noted, in dismissing Calpetco's claim that Marshall misrepresented the productive lives of the wells, the district court found that Michael was a sophisticated investor and, therefore, did not rely on any such representation.  This, too, means that the security was not offered or sold "by means of an untrue statement of a material fact."  Article 581-33A.(2) has been construed to mean that the alleged misrepresentation must relate to the security and "induce[] the purchase thereof".  *Nicholas v. Crocker*, 687 S.W.2d 365, 368 (Tex. App.--Tyler 1984, writ ref'd n.r.e.).  The district court's factual finding is essentially a determination that Marshall's statement -- if made at all -- did not induce Calpetco's investment.