**INSURANCE COMPANY OF NORTH AMERICA, Appellant,**

v.

**John W. MORRIS, Rebecca S. Red, John T. Person, Bernice Person, Graham Glass, Sherrie Glass, Earl Lowe and Audrey Lowe, Appellees,**

v.

**WAITE HILL SERVICES, INC., Appellant.**

No. 14–94–00310–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 20, 1996.

Rehearing Overruled Sept. 12, 1996.

David C. Mattka, Michael Kevin Queenan, Lisa D. Stewart, Dallas, for appellants.

James E. Doyle, Andrew R. Harvin, Houston, for appellees.

Before MURPHY, C.J., and AMIDEI and ANDERSON, JJ.

## OPINION

AMIDEI, Justice.

This appeal is from a judgment awarding damages to investors in syndicated oil and gas partnership investments. Appellant, Insurance Company of North America ("INA"), was the surety for guaranty bonds issued in connection with promissory notes executed as part of the purchase of investment shares in two partnerships called Overlord III and IV. Appellant, Waite Hill Services, Inc. ("Waite"), was INA's managing general agent and the underwriter of INA's surety bonds. Commonwealth Enterprises, Inc. ("Commonwealth"), a Tennessee corporation, was the syndicator and general partner of Overlord III and IV.[1] Appellees are John W. Morris, Rebecca S. Red, John T. and Bernice Person, Graham and Sherrie Glass, and Earl and Audrey Lowe ("the Investors"). The jury found INA, through the acts and omissions of its agents, committed unconscionable acts, and aided and conspired in securities and common law fraud. INA and Waite appeal in twenty-nine points of error.[2]

---

1. Commonwealth was not named as a party to this action, apparently having filed for bankruptcy protection.

2. The parties stipulated Waite acted as managing agent for INA in connection with the Overlord III and IV limited partnership programs. The judgment reflects the affirmative findings against INA are also attributable to Waite. INA and Waite filed a joint brief and collectively referred to themselves as "INA."

## I. BACKGROUND

In 1982, Gordon Phillips of Gordon B. Phillips & Company (collectively "Phillips"), a Florida insurance agent, contacted Colony Insurance Company ("Colony"), a surplus lines carrier and reinsurer, about marketing surety bonds for limited partnership programs. Phillips, with Colony and its affiliate, Waite, developed a limited partnership investor bond program and sought a reputable insurance company with "name identification" to market the program. They chose INA as the front company because it had a good reputation and an A+15 rating.

In 1983, Phillips became a marketing agent for INA's surety bond programs. As such, Phillips reviewed and screened syndicator offerings and submitted programs to INA which were eligible for bonding. Phillips hired Locke Burgess ("Burgess") to handle the surety bond business. Burgess reviewed the private placement memoranda ("PPMs") and other documents for these programs and helped structure the deals in accordance with criteria set by INA. Waite, as managing agent, underwrote limited partnership programs for INA.

Commonwealth used Bruno Trimpoli ("Trimpoli"), its Chairman of the Board of Directors, to find lenders to finance its oil and gas drilling operations and insurance companies to issue financial guaranty surety bonds. Phillips contacted Trimpoli to discuss underwriting and issuing investor surety bonds for Commonwealth's oil and gas programs. In June 1983, Trimpoli and John Meatte ("Meatte"), Commonwealth's president, met with Phillips to discuss additional financing sources and investor surety bonding. Trimpoli testified at trial that, following this meeting, Burgess asked him to furnish copies of PPMs for previous Commonwealth programs. In July 1983, Trimpoli provided the PPMs on four earlier programs. Ten days later, Burgess called Trimpoli and was upset because he discovered in the old PPMs that Meatte had an SEC injunction against him.[3] According to his trial testimony, Trimpoli informed Burgess that Commonwealth's

counsel, Laken Mitchell, had a legal opinion concluding the injunction was a moot issue. Burgess recognized the injunction was a problem, but nevertheless continued to work on concluding a deal.

Trimpoli furnished Phillips a draft format of the Commonwealth–INA program and sought Phillip's comments. In May 1984, Burgess notified Trimpoli the program had been "turned down" as a result of his underwriting due diligence. Commonwealth planned to dedicate only 68% of funding to drilling. Waite required changes, which allowed brokers to receive special limited partnership units through non-recourse promissory notes, diluting the Investors' interests and meeting INA's requirement that 80% of the funding be dedicated to drilling. In June 1984, Phillips confirmed Waite would participate in the Commonwealth oil and gas programs on behalf of INA.

The surety bonds issued by INA, as front company, were underwritten and executed by Waite, its managing general agent. As part of the underwriting process, Phillips and Waite evaluated the "track record" of the syndicator and the quality and economic viability of the drilling program. Waite reviewed a summary for each program prepared by Phillips or Energy Assurance Company, a firm which assisted in research and evaluation. Waite also selected and paid Bancapital Corporation to prepare due diligence reports on the geology. Waite, Phillips and their counsel then reviewed, approved or modified the PPM for each program. INA included information in the PPMs and had authority to, and did, require changes at times. After the programs were approved, Phillips and Waite screened and approved investors.

From October to December 1984 the Investors were contacted by investment advisers, Joseph Ace and Stephen Gunnels, who were salesmen acting for INA and Commonwealth. Ace, who sold the investments to all Investors except Red, was a general partner in Overlord III and IV. Ace and Gunnels furnished the Investors with PPMs describ-

---

3. The SEC injunction was entered in *SEC v. Sterling Enterprises, Inc.*, Civil Action No. 79–C–3421, in the United States District Court for the

Northern District of Illinois. Meatte was permanently enjoined from selling unregistered securities.

ing the investments in Overlord III and IV. Samples of INA's bond documents were included in the PPMs, and the salesmen touted the underwriting involvement of INA to sell the programs. The Investors testified they did not read all of the PPMs, which amounted to over 200 pages, but relied on the explanations provided by Ace and Gunnels and the summary included in the package of information.

The PPMs provided that the Investors had an option to purchase Overlord units in cash or make a down payment and sign a promissory note for the balance. According to their testimony, the Investors were presented only the leveraged option. The Investors invested in one or both of the Overlord programs.[4] Each unit sold for $20,000, of which they paid $5,000 in cash and executed a note for the balance. These notes were assigned to a lender as collateral for operating loans to the partnerships. The notes were secured by the surety bonds issued by INA, which obligated INA to pay the notes in the event the Investors defaulted. As part of the investment package, the Investors signed an indemnification agreement promising to reimburse INA for payments made under the bonds.

About one month after their purchase of the investments, the Investors testified they received additional documents requiring their signatures, including a new six-page surety bond. They testified the salesmen told them there had been a "printing error," the additional documents contained no new terms, failure to sign would cause forfeiture of their down payments, and the documents were required to be returned immediately. The Investors signed the additional documents, not learning until later that they contained disclaimers as to INA's involvement in the programs.

The Investors each made at least one installment payment on the notes before pay-

ments ceased in 1986. The Investors discovered the programs they had purchased were not the safe, low-risk investments they had thought. They came to the conclusion that the Overlord programs were sold to them based on fraud and misrepresentations. After default on the promissory notes, INA paid the notes as obligated by its bonds, and the lenders assigned the Investors' promissory notes to INA. INA made demand on the Investors for reimbursement pursuant to the indemnification agreements. When no reimbursement was made, INA then sued the Investors. The Investors counterclaimed and brought third party claims against Waite, alleging violations of the Texas Deceptive Trade Practices Act ("DTPA"),[5] the Texas Securities Act ("TSA"),[6] fraud, conspiracy and breach of the duty of good faith and fair dealing. The jury found in favor of the Investors on each of these claims and awarded damages. The jury also found the Investors were not liable on the promissory notes or indemnity agreements they had executed in connection with their purchases of the Overlord units. The Investors elected the greater recovery permitted under the DTPA, and the trial court entered judgment for damages totalling $435,000, including mandatory and additional damages under the DTPA, plus attorney's fees in the amount of $400,000. The judgment declared the notes, bonds and indemnification agreements unenforceable.

The central issues in this appeal concern the degree of INA's participation in the structuring, promotion and sales of the investments, and the authority of agents underwriting and marketing the investments to bind INA by their actions. INA argues the Investors wrongfully consider sale of the oil and gas investments to be the same as the sale of the surety bonds provided by INA. INA contends it merely issued the surety bonds and was not a party to any fraud or

---

4. Morris purchased two units in each program. Red purchased one unit in Overlord III and one in Overlord IV. Investors Glass, Lowe and Person purchased one unit each (per married couple) in Overlord III.

5. Tex.Bus. & Com.Code Ann. § § 17.46, 17.50 (Vernon 1987 & Supp.1996). Where the DTPA has been amended, references in this opinion are to

the version in effect at the time of the transactions, before the 1989 and 1995 amendments. See Act effective August 27, 1979, 66th Leg., R.S., ch. 603, 1979 Tex.Gen.Laws 1327, 1327–32.

6. Tex.Rev.Civ.Stat.Ann. art. 581–33 (Vernon Supp. 1996).

misrepresentations in connection with the investments.

## II. AGENCY

In points of error one through five, INA complains the trial court erred in instructing the jury on common law and statutory agency theories. The court included in the charge an instruction on statutory agency and definitions of actual and apparent authority of an agent to bind a corporation.

We review charge error under an abuse of discretion standard while recognizing that there is a presumption in favor of broad-form submission of questions. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The trial court has wide discretion in submitting explanatory instructions and definitions. *Wisenbarger v. Gonzales Warm Springs Rehab. Hosp., Inc.*, 789 S.W.2d 688, 692 (Tex.App.—Corpus Christi 1990, writ denied). Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and aid the jury in answering the questions in the charge. Tex.R.Civ.P. 277, 278.

If error in the charge is found, we then review the pleadings, evidence, and the entire charge to determine if the error is harmful. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). To reverse a judgment based on error in the charge, appellants must establish the error complained of amounted to such a denial of the rights of the appellant that it was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. Tex.R.App.P. 81(b)(1).

In INA's first point of error, it complains the trial court abused its discretion in submitting instructions on agency when there was no question on agency submitted. INA objected to the submission of the agency instructions. INA did not object, however, to the charge's omission of an agency question. When a question is omitted which constitutes only a part of a ground of recovery, and other questions referable to that ground are submitted and answered, the omitted elements are deemed found in support of the judgment if no objection is made and they are supported by some evidence. *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990); Tex.R.Civ.P. 279. Agency was, at most, an element of the Investors' causes of action rather than an independent ground of recovery. INA was therefore required to object to the omission of an agency question. In the absence of an objection, the agency relationships imputing liability to INA are deemed found.

Even though it was not INA's burden to prove agency, it was required to object to the omission of this question. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 239 (Tex.1992) (state preserved error by submitting the missing element of a question, even though it did not have the burden of proof); *Religious of Sacred Heart v. City of Houston*, 836 S.W.2d 606, 613–14 (Tex.1992) (city preserved error by objecting to the omission of a proper damage question, on which plaintiff had the burden); *Ramos*, 784 S.W.2d at 668 (defendant should have objected when court did not submit an element of plaintiff's cause of action). INA has waived its complaint as to the failure to submit an agency question. Tex.R.Civ.P. 274, 278. We overrule point of error one.

Next, in point two, INA contends the court erred in instructing on agency because the promoters who sold the investments were not agents of INA as a matter of law. In points three and four, INA challenges the legal and factual sufficiency of the evidence supporting an implied or express finding of agency or of any misrepresentation by an agent regarding the surety bonds.

In reviewing a "no evidence" or legal sufficiency of the evidence point, we consider only the evidence and reasonable inferences tending to support the jury's finding, and we disregard any evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex. 1992). After this review, if there is more than a scintilla of evidence of probative force supporting the finding, then we must uphold the finding. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). Factual sufficiency points of error require us to consider and weigh all the

evidence. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We will not set aside the verdict unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.*

■■■■■ Actual authority of an agent includes express and implied authority. *Moody v. EMC Servs., Inc.,* 828 S.W.2d 237, 241 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Express authority exists where the principal makes it clear to the agent that he wants the act in question done. *Haywood, Jordan, McCowan of Dallas, Inc. v. Bank of Houston,* 835 S.W.2d 738, 742 (Tex.App.—Houston [14th Dist.] 1992, no writ). Implied authority exists where there is no proof of express authority, but appearances justify a finding that in some manner the agent was authorized to do what he did. *Id.*

■■■■■ Apparent authority, on the other hand, is a form of estoppel where a third party relies on conduct of the principal which would lead a reasonably prudent person to believe the agent had authority to act. *Ames v. Great Southern Bank,* 672 S.W.2d 447, 450 (Tex.1984). Apparent authority arises either from a principal knowingly permitting an agent to hold himself out as having authority, or by a principal's actions which lack such ordinary care as to clothe an agent with indicia of authority, thus leading a reasonably prudent person to believe the agent has the authority he purports to exercise. *Id.; Paramount Nat'l Life Ins. Co. v. Williams,* 772 S.W.2d 255, 262 (Tex.App.—Houston [14th Dist.] 1989, writ denied).

■■■■■ Actual authority is not required for an insurance company to have vicariously committed a deceptive act or practice. *Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688, 693–94 (Tex.1979). An insurance company is generally liable for any misconduct by an agent that is within the actual or apparent scope of the agent's authority. *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 98 (Tex.1994). In determining a principal's vicarious liability, the test is whether the agent was acting within the scope of the agency relationship at the time of committing the act, not whether the principal authorized the specific wrongful act. *Id.* at 99.

■■■■■ Our review reveals sufficient evidence in the record to support an implied finding of agency. Misrepresentations were made to the Investors by INA's statutory agents acting with implied or apparent authority, within the scope of their authority to sell the investments and surety bonds.

The Investors testified they believed Ace and Gunnels represented INA, as well as Commonwealth, in selling the investments. The jury could reasonably have determined Ace and Gunnels were clothed with authority to represent INA in the sale of the surety bond financed investments by virtue of INA's conduct. First, INA permitted the use of its name in the PPMs, which it approved before agreeing to participate in the programs. Testimony showed bonding was critical to the success of the programs, and INA allowed its name to be used as a marketing tool. The name and reputation of INA, as front company, and its surety financing were vital to the promotion of the programs. The offering memoranda, approved by Waite and Phillips, promoted low-risk developmental drilling because of INA's involvement. According to the Investors, Ace and Gunnels represented to them the programs were sound because INA was involved. Investor Glass testified Ace told him: "INA would not ever put their name on a package like this if they had not thoroughly investigated the package."

■■■■■ In addition, INA permitted the sales agents to take applications and collect premiums for its surety bonds at the same time the Investors were presented with the Overlord programs. Because INA required 80% investor participation, the surety bond financing documents were packaged with, and submitted to, the Investors as part of the offering memoranda, and none of the Investors were offered the cash option. INA violated the Texas Insurance Code by allowing the investment and bonds to be sold by salesmen, Ace and Gunnels, who were not licensed insurance agents in Texas. *See* TEX. INS.CODE ANN. arts. 21.07, 21.09 and 21.14

(Vernon 1981).[7] INA failed to ensure independent, licensed agents presented and explained the bonds independently of the securities, which permitted Ace and Gunnels to misrepresent INA's investigation of Commonwealth and the soundness of the programs. Because the surety bonds and partnership units were sold to the Investors as an integrated investment, INA cannot now attempt to separate its sale of surety bonds from the limited partnership interests.

Waite, stipulated to be INA's agent, and Phillips, INA's marketing and underwriting servicing agent, jointly developed and structured the Overlord programs with Commonwealth. INA's involvement and control over the structure of the Overlord investments is shown by the following evidence: INA required 80% of the Investors to use the surety financing. Waite and Phillips had the authority to review, modify and approve the PPMs and they exercised that authority. Waite and Colony, Waite's affiliate which reinsured much of the risk, purported to follow underwriting criteria that the syndicator have a "good success record" and the investment activities be "sound." The underwriting criteria of Waite and Colony specified that the wells should "be mostly developmental" and set a minimum number of wells to be drilled. Waite and Phillips had the right to review and approve the geology for the program and they did so. Waite and Phillips required a certain minimum percentage of the Investors' capital contributions be dedicated to drilling developmental wells. Waite and Phillips had the right to reject or approve the Investors. Waite and Phillips reserved the right to cancel financing for each program or series of programs, rather than just for individual Investors.

In addition, the documents in the PPMs were compiled with input from INA and its agents, Waite and Phillips. Locke Burgess, a Phillips employee, had knowledge of the Meatte injunction. The injunction was not disclosed in the Overlord PPMs and the Investors provided expert testimony that this omission constituted a violation of Texas securities laws. Waite and Phillips had knowledge of the poor returns on past Commonwealth programs. Even though some notice of poor returns was buried in fine print in the 200–plus page PPMs, there was expert testimony that these disclosures were insufficient and also constituted violations of securities laws.

At trial, Bruno Trimpoli testified about the disclosure of the Meatte injunction to Locke Burgess. INA attempted to impeach Trimpoli's testimony with inconsistent statements from his deposition. The jury, as the sole judge of credibility, apparently believed Trimpoli's trial testimony. This court is not a fact finder, and we may not pass on the credibility of the witnesses or substitute our judgment for that of the trier of fact. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). In addition, Meatte confirmed much of Trimpoli's trial testimony and also testified he had discussed the injunction with Ace many times. Ace never disclosed the existence of the injunction to Investors.

To the extent misrepresentations in the PPMs were the producing cause of the Investors damages, INA is liable. It is immaterial to INA's imputed knowledge that discovery of the Meatte injunction was made in 1983 and the oil and gas programs were not sold until 1984. *See Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 356 (Tex.1965); RESTATEMENT (SECOND) OF AGENCY § 276 cmt. a (1958) (principal bound by whatever knowledge agent has irrespective of its source or time of acquisition).

 INA is also responsible for the acts of Ace and Gunnels by statute. Under the Texas Insurance Code, a person is an agent for an insurance company if he solicits insurance on behalf of the company, transmits an application or policy to or from the company, or receives or collects premiums for an insurance product. TEX.INS.CODE ANN. art. 21.02 (Vernon Supp.1996). Ace and Gunnels solicited the Investors' participation in the surety bond financed investments, took and transmitted their applications, and col-

---

7. We note that INA is authorized to transact various kinds of insurance business, including fidelity and surety, in Texas.

lected the premiums. Therefore, they were INA's agents. Even though a soliciting agent does not bind an insurer by his misrepresentations, his actions may still impose DTPA liability on the insurer. *Paramount Nat'l Life Ins.*, 772 S.W.2d at 261. For these reasons, we find ample evidence supporting an agency finding.

In our factual sufficiency review, we consider evidence contrary to an implied finding of agency. This evidence includes Phillip's deposition testimony that he only had underwriting and bonding authority for INA. He later conceded that the scope of his agency included marketing, producing, underwriting and servicing for INA. Phillips denied he had authority to bind INA concerning the bonds. He testified that he never represented that he had authority to commit INA to the bonding program. However, this testimony is contradicted by a letter he signed on behalf of INA addressed to Trimpoli of Commonwealth conditionally committing to the bonding program. No direct employee of INA testified to deny the agency relationships. Neither Ace nor Gunnels testified to controvert the Investors' testimony. INA contends it did not control the manner in which the promoters solicited the investments, and that it did not express approval of their conduct. No evidence is cited to establish these facts.

We are not persuaded by INA's argument that Ace and Gunnels could not have acted as its agents because the Investors signed documents disclaiming any agency between INA and the promoters and marketers of the Overlord investments. INA relies on a letter signed by each Investor acknowledging, among other things, that: no representative of Overlord III or IV was authorized to speak or act for INA; no INA representative purported to act or speak for Overlord III or IV; INA had no involvement in the recommendation or sale of Overlord III or IV to the Investors; INA did not give investment advice; the Investors did not rely on INA's willingness to issue its investor bonds in making their investments; and INA relied

only on the Investors' creditworthiness in making its decision to issue the bonds. This court has previously rejected a similar attempt by an insurance company to protect itself with a statement that it was not bound by its agent acting with apparent authority. *See Paramount Nat'l Life Ins.*, 772 S.W.2d at 262 (company's actions in giving the agent its forms and referring to him as agent contradicted its attempt to limit his authority); *see also Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex.1985) (permitting evidence of oral misrepresentations made before and after the execution of the contract which formed the basis of a DTPA claim). Furthermore, these letters were not included in the original PPMs or the original documents signed by the Investors. Instead, they were submitted to the Investors *after* they had subscribed and paid their down payments. Contrary to the assertions in these letters, there is evidence INA and its agents were involved in the recommendation and sale of Overlord III and IV. Based on the evidence, the jury was entitled to disregard the purported agency disclaimers.

■ We also reject INA's argument that its agents' authority to make representations did not extend beyond the terms of the surety bonds. INA relies on the current version of article 21.02 of the Insurance Code as authority. However, the pertinent language was added by amendment which was not effective until after these bonds were sold and the representations at issue had been made. *See* Tex.Ins.Code Ann. art. 21.02 (Vernon Supp.1996).[8] The existing law in 1984 when the investments were sold imposed liability upon the principal even though an agent may have exceeded his actual authority. *See Royal Globe Ins.*, 577 S.W.2d at 693–94 (holding principal liable for deceptive acts of agent where principal did not authorize and had no knowledge they occurred).

The jury could have determined from the evidence presented that Ace and Gunnels were dual agents of Commonwealth and

---

**8.** The pertinent language added by the 1985 amendment is as follows:

This article does not authorize an agent to orally, in writing, or otherwise alter, amend, modify, waive, or change a term or condition

of an insurance policy or application for an insurance policy.

Act effective May 24, 1985, 69th Leg., R.S., ch. 203, § 1, 1985 Tex.Gen.Laws 790.

INA. Waite's agency was stipulated, and there is ample evidence Phillips, and his employee, Burgess, were agents for INA. We conclude the implied findings of agency are supported by legally and factually sufficient evidence. We overrule points of error three and four.

 In point five, INA claims the surety bonds were not regulated as the "business of insurance" in Texas. Therefore, it contends application of any provisions of the Insurance Code is improper in this case. One of the stated purposes of Article 1.14–1 of the Texas Insurance Code is to protect the residents of this state against persons and insurers not authorized to conduct insurance business in this state. As defined in the statute, the "business of insurance" includes surety contracts. TEX.INS.CODE ANN. art. 1.14–1(2)(a)(2) (Vernon Supp.1996).[9] INA argues an exception applies because it initially committed to the bond program outside the state of Texas. Article 1.14–1 does not apply to:

> transactions in this state involving a policy lawfully solicited, written, and delivered outside of this state covering only subjects of insurance not resident, located, or expressly to be performed in this state at the time of issuance, and which transaction are subsequent to the issuance of such policy....

TEX.INS.CODE ANN. art. 1.14–1(2)(b)(3) (Vernon Supp.1996). INA's contention that its commitments to Commonwealth were made outside Texas is of no consequence because the surety bonds and applications were presented to Texas residents who signed them in Texas. The bonds covered note obligations incurred by the Investors in Texas. We conclude the Code's exception for policies made outside Texas does not apply. We overrule point five.

### III. DTPA

 First, INA's argument that the DTPA claims are time-barred has been waived by failure to assign a point of error

on appeal. TEX.R.APP.P. 74(d); *Barbouti v. Munden,* 866 S.W.2d 288, 298 (Tex.App.—Houston [14th Dist.] 1993, writ denied).

### A. Consumer Status

 INA argues in point seven that the Investors are not consumers under the DTPA. The Investors contend this complaint is waived because it was not raised until INA's motion for JNOV. A motion for JNOV is based upon the same grounds that have or could have been urged in a motion for directed verdict. TEX.R.CIV.P. 301. A directed verdict or a JNOV is proper when: (1) a defect in the opponent's pleadings makes the pleadings insufficient to support a judgment; (2) the facts establish the right of the movant or negate the right of its opponent to judgment as a matter of law; or (3) there is no evidence or the evidence is legally insufficient to raise an issue as to one or more facts that the opponent must establish to be entitled to judgment. *Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc.,* 891 S.W.2d 342, 346–47 (Tex.App.—Amarillo 1995, writ denied) (directed verdict); *Rowland v. City of Corpus Christi,* 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e) (JNOV). Because lack of consumer status would negate appellants' entitlement to judgment based on their DTPA claims as a matter of law, INA's motion preserved error.

 The plaintiff's status as a consumer is a question of law for the trial court. *Kenneth H. Hughes Interests, Inc. v. Westrup,* 879 S.W.2d 229, 234 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Under the DTPA, a "consumer" is one who "seeks or acquires by purchase or lease, any goods or services...." TEX.BUS. & COM.CODE ANN. § 17.45(4). To qualify as a "consumer" under the DTPA, a party must also establish the goods or services purchased or leased form the basis of the complaint. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981).

---

9. The Texas Supreme Court recently held suretyship does not constitute the "business of insurance" under article 21.21 of the Insurance Code. *Great Am. Ins. Co. v. North Austin MUD No. 1,* 908 S.W.2d 415, 424 (Tex.1995). Liability under article 21.21 is not at issue here, and this limitation does not extend to other suretyship provisions in the Code. *See id.* at 422–424.

The plaintiff establishes standing as a consumer in terms of his relationship to the transaction, not by a contractual relationship with the defendant. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 368 (Tex. 1987). The defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed in connection with the plaintiff's transaction in goods or services. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 650 (Tex.1996).

The DTPA defines "goods" as "tangible chattels or real property purchased or leased for use." TEX. BUS. & COM.CODE ANN. § 17.45(1). "Tangible chattels" are "those items of personal property which may be seen, weighed, measured, felt or touched." *United Postage Corp. v. Kammeyer*, 581 S.W.2d 716, 721 (Tex.Civ.App.—Dallas 1979, no writ). Intangibles are not goods for purposes of DTPA consumer status. *See Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex.1980) (money); *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 498 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (commodity option contracts); *Portland Sav. & Loan Ass'n v. Bevill, Bresler & Schulman Gov't Sec., Inc.*, 619 S.W.2d 241, 245 (Tex.Civ.App.—Corpus Christi 1981, no writ) (securities); *Snyders Smart Shop, Inc. v. Santi, Inc.*, 590 S.W.2d 167, 170 (Tex.Civ. App.—Corpus Christi 1979, no writ) (accounts receivable); *see also Marshall v. Quinn–L Equities, Inc.*, 704 F.Supp. 1384, 1393 (N.D.Tex.1988) (interests in limited partnerships for real estate development).

When the purchase of an intangible is intertwined with the purchase of a good, the DTPA's definition of consumer is satisfied. *See Hand*, 889 S.W.2d at 500. To acquire these partnership interests, the Investors were required to purchase INA's surety bonds. The surety bond, as an insurance contract, is an intangible. The limited partnership agreements are securities, normally considered intangibles. *See* TEX.REV. CIV.STAT.ANN. art. 581–4 (Vernon Supp. 1996) (defining the term "securities" as including interests in limited partnerships). The Investors cite to federal cases holding that the purchase of intangibles can qualify as goods when the underlying subject matter constitutes a good. *See MBank Fort Worth v. Trans Meridian, Inc.*, 820 F.2d 716, 719 (5th Cir.1987) (interests in oil and gas lease purchased through investment in drilling venture were interests in real property and qualified as both goods and securities under Texas law) (citing *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex.1982) (holding an oil and gas lease is a sale of an interest in land, vesting the lessee with title to the oil and gas in place)); *In Re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 520 (S.D.N.Y.1987) (holding gas reclamation units purchased by investors were "goods" as defined by the Texas DTPA). The Fifth Circuit questioned its holding in *MBank* in *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1417 n. 22 (5th Cir.1993). The court noted recent Texas appellate court opinions found nonoperating owners were not consumers of administrative and managerial services rendered under oil. and gas operating agreements. *Id.* (citing *Johnston v. American Cometra, Inc.*, 837 S.W.2d 711 (Tex.App.— Austin 1992, writ denied) and *Anderson v. Vinson Exploration, Inc.*, 832 S.W.2d 657 (Tex.App.—El Paso 1992, writ denied)). We find these latter opinions better reasoned, and consequently, we hold purchase of these limited partnership interests in oil and gas leases, intertwined with the purchase of surety bonds, do not constitute a purchase of "goods" under the DTPA.

The Investors claim, however, they are consumers of services through the bonding and underwriting services INA provided. INA's fees were paid from the Investors' capital contributions. "Services" are defined by the DTPA as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." TEX. BUS. & COM.CODE ANN. § 17.45(2) (Vernon 1987). "Services" include services sought or purchased outright, and services connected with the acquisition of goods. *See Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex.1977). When a transaction's central objective is the acquisition of an intangible, Texas law requires that the collateral services be an important object to the transaction and not merely incidental.

*Hand,* 889 S.W.2d at 500; *Texas Cookie Co. v. Hendricks & Peralta, Inc.,* 747 S.W.2d 873, 877 (Tex.App.—Corpus Christi 1988, writ denied); *FDIC v. Munn,* 804 F.2d 860, 865–66 (5th Cir.1986).

Most courts conclude the term "services," as defined in the DTPA, includes the purchase of insurance policies when misrepresentations are made concerning the policy. *See 3Z Corp. v. Stewart Title Guar. Co.,* 851 S.W.2d 933, 937 (Tex.App.—Beaumont 1993, writ denied); *McCrann v. Klaneckey,* 667 S.W.2d 924, 927 (Tex.App.—Corpus Christi 1984, no writ); *Dairyland & County Mut. Ins. Co. of Texas v. Harrison,* 578 S.W.2d 186, 190 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ); *see also HOW Ins. Co. v. Patriot Fin. Serv. of Texas, Inc.,* 786 S.W.2d 533, 539 (Tex.App.—Austin 1990, writ denied) (holding that insuring another's performance constitutes a "service" under the DTPA).

■ Investor Glass testified that the surety bond provided a service to the Investors because INA's agreement to guarantee their loans made financing more convenient than trying to obtain a loan individually. The jury found no misrepresentations concerning the surety bond, and the trial court refused to submit questions as to whether misrepresentations were made concerning services. The jury found, however, INA committed an unconscionable action or course of action. A finding of an unconscionable course of action is sufficient to support a DTPA action even in the absence of specific misrepresentations. *Commercial Escrow Co. v. Rockport Rebel, Inc.,* 778 S.W.2d 532, 538 (Tex.App.—Corpus Christi 1989, writ denied).

■ In addition, the Investors' relied on INA's underwriting services. The Investors' purchases of interests in Overlord III and IV were based in part on these underwriting services, provided through its managing agent, Waite, and its underwriting service agent, Phillips. Services related to the sale of securities are actionable under the DTPA. *See Nottingham v. General Am. Communications Corp.,* 811 F.2d 873, 878 (5th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987) (holding services provid-

ed in connection with purchase of tax sheltered investments were also objectives of transaction sufficient to create DTPA consumer status).

■ The Investors also relied on advice from Ace and Gunnels regarding the soundness of the investment and INA's involvement in underwriting the programs. The purchase of investment and counseling services qualifies for consumer status under the DTPA. *See Frizzell v. Cook,* 790 S.W.2d 41, 47 (Tex.App.—San Antonio 1990, writ denied); *see also First Federal Sav. & Loan Ass'n v. Ritenour,* 704 S.W.2d 895, 899–900 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e) (finding DTPA consumer status when financial counseling services are purchased with a certificate of deposit).

■ The core of the Investors' complaints against INA involve its underwriting services. INA's investigation, along with the misrepresentations as to the soundness of the investment made by INA's agents, greatly influenced their decision to invest. Thus, these services can be said to "form the basis of the complaint." We hold the Investors are consumers of services as defined in the DTPA. We overrule point of error seven.

### B. Unconscionability

■ In point eight, INA contends the judgment is in error because the jury's finding of "unconscionable conduct" under the DTPA does not constitute a violation of the Insurance Code. Consumers are entitled to relief under the DTPA where an unconscionable action or course of action is the producing cause of damages. TEX. BUS. & COM.CODE ANN. § 17.50(a)(3).

■ Article 21.21 of the Texas Insurance Code created a private cause of action for damages from practices declared to be "unfair or deceptive" in section four of article 21.21, the rules and regulations of the State Board of Insurance as adopted under article 21.21, or in section 17.46(b) of the Texas DTPA. TEX.INS.CODE ANN. art. 21.21 § 16 (Vernon Supp.1996); *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 147 (Tex.1994). If a claim is brought under Article 21.21, the

claimant does not have to allege and prove consumer status. *Aetna Cas. & Sur. Co. v. Marshall,* 724 S.W.2d 770, 772 (Tex.1987).

█ INA argues the Investors may not recover for unconscionable conduct because it is not declared an "unfair or deceptive" act in section 17.46(b) of the DTPA. DTPA violations under Section 17.50, as opposed to Section 17.46, are not grounds for liability under the Insurance Code and are available only to consumers. *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995). Section 17.50 of the DTPA provides a cause of action to consumers independent of the "laundry lists" in Section 17.46 and Article 21.21 of the Insurance Code. *Id.* INA's reliance on *Faircloth* is therefore misplaced. In *Faircloth,* the plaintiff could not recover for any "unconscionable course of conduct" because she did not have consumer status. *Id.* Because we have determined the Investors are consumers under the DTPA, they may sue for unconscionable conduct irrespective of the Insurance Code. We overrule point of error eight.

█ In point nine, INA argues the court erred in basing the judgment on DTPA because the Investors received benefits under the policies. It asserts that not only were the Investors able to make a tax-advantaged, leveraged investment, but INA honored its bond obligations by paying the notes. Thus, INA contends the Investors suffered no actual damages due to its conduct. The Investors respond that they did not receive benefits. Their investments are now valued at zero. While the Investors received tax deductions for 1984–86, they are exposed to IRS recapture penalties because they stopped paying the notes. Deductions taken after 1986 were for legal fees in this litigation. Furthermore, the remedies under the DTPA are not waived because of acceptance of performance. *See Kennemore v. Bennett,* 755 S.W.2d 89, 91 (Tex.1988) (rejecting a similar acceptance of benefits argument). We overrule point of error nine.

█ INA challenges the sufficiency of the evidence to support the jury's DTPA findings in point ten. The jury was instructed that "[a]n unconscionable action or course of ac-

tion is an act or practice that, to a person's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." *See Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985).

The Investors cite the following as evidence of INA's unconscionable actions: INA, through Waite and Phillips, performed underwriting services, but failed to disclose to the Investors that Meatte was under an SEC injunction and that Commonwealth's previous programs had performed poorly. Before INA and Waite approved the Commonwealth bonding program, Locke Burgess, a Phillips employee, reviewed PPMs for prior programs, which disclosed the Meatte injunction. This knowledge, acquired as part of INA's agents' duties in screening potential syndicators and the viability of their programs, was imputed to INA. *See Williams v. Jennings,* 755 S.W.2d 874, 883 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (holding principal bound by knowledge his agent could have acquired through ordinary diligence when agent was in possession of information sufficient to instigate inquiry).

INA failed to ensure licensed agents would present and explain the surety bond agreements. It permitted Ace and Gunnels, unlicensed salesmen, to present the bonds and indemnification agreements to the Investors. Phillips and Waite's claims representative, Hollberg, both admitted these documents were complicated and that it was important for trained persons to explain the products to the customers. The salesmen falsely told Investors past programs had averaged returns of two or three to one. The Investors also blame the use of unlicensed agents for the unconscionable "bait and switch" tactics used with respect to the substitution of a six-page bond and letter attempting to preclude the Investors' claims against INA. The salesmen falsely told the Investors there were no changes in the substituted documents.

INA did not require the lenders to timely make demand for payment before it honored the surety bonds. The Investors were not told INA could sue them in the event of default, but instead they were told they would merely lose their partnership inter-

ests. INA pursued collection efforts against Investor Red, despite evidence of her payment of the notes. INA did not disclose it actually had only 25% of the risk, with the remainder covered through Colony's reinsurance. *See Brown v. Galleria Area Ford, Inc.*, 752 S.W.2d 114, 116 (Tex.1988) (failure to disclose responsibility created confusion and took advantage of the plaintiff's lack of knowledge supporting liability for unconscionable conduct); *State Farm Fire & Cas. Co. v. Gros*, 818 S.W.2d 908, 913 (Tex.App.—Austin 1991, no writ) (holding misrepresentation of terms of coverage of homeowner's policy sufficient to support a finding of unconscionable conduct); *see also Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518–19 (Tex.1988) (finding insurer's failure to disclose agents' authority to write coverage had been withdrawn was unconscionable). This evidence is sufficient to support a finding INA took advantage of the Investors' inexperience and lack of knowledge to a grossly unfair degree.

INA does not cite to evidence contrary to the jury's finding of unconscionability under this point. Nevertheless, our review of the contrary evidence reveals that there was evidence presented that some of the Investors had prior experience in high risk investments. Investor Lowe admitted INA did not prevent him from reading the entire PPM before investing. Even though Ace told him all important information was contained in the summary in the PPM, the summary advised that it was for quick reference only and the entire PPM should be read. The PPMs contained disclaimers that the investments were high risk. Investor Morris admitted he did not read all the documents or ask questions before he signed them. He acknowledged that the PPM disclosed he could have paid cash for the investment. INA attempted to impeach the Investors with statements from their depositions where they agreed INA had not made misrepresentations to induce them to invest. They explained, however, that before discovery was completed, they were unaware of the extent of INA's involvement. This contrary evidence is not so overwhelming as to render the jury's finding unjust.

We conclude that the evidence in the record is both legally and factually sufficient to support the jury's finding that INA, through its agents Waite, Phillips, Ace and Gunnels, violated the DTPA. We overrule point of error ten.

## C. Damages

■ INA attacks the damages findings in point eleven. First, it contends the Investors failed to plead for consequential damages. In addition to separately requesting mental anguish damages for each Investor, they sought "all damages which they have incurred and are recoverable pursuant to the causes of action stated herein, including their losses and damages for mental anguish. The mental anguish suffered by the Investors includes emotional distress and financial hardship (e.g., the loss of credited [*sic*]) associated with the wrongful acts of INA. . . ." We find the Investors' pleadings sufficient to satisfy the fair notice requirements for pleadings. TEX.R.CIV.P. 45; *Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex.1991).

■ INA argues next the trial court should have separately submitted consequential damages, relying on *Odom v. Meraz*, 810 S.W.2d 241, 244 (Tex.App.—El Paso 1991), *writ denied per curiam*, 835 S.W.2d 626 (Tex.1992). In denying the application for writ of error, the supreme court neither approved nor disapproved of the Court of Appeals' disposition of the DTPA damages in *Odom*. 835 S.W.2d at 626. We are not cited to any other cases imposing a requirement for separate submission of consequential damages. We instead believe that such a practice is contrary to the broad form submission mandated by our rules of procedure. *See* TEX.R.CIV.P. 277. In this case, the jury was instructed that it was to consider the "total loss sustained" by each investor, including the net economic loss, and consequential losses, including reasonable expenses, damages for impairment of credit, and damages for mental anguish. "Mental anguish" was defined in the instruction as "mental sensation of pain resulting from such painful emotions as grief, severe disappointment, wounded pride, shame, despair, and

public humiliation." As it is not affirmatively incorrect and is supported by some evidence, we find no abuse of discretion in the trial court's submission of this instruction. *See Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex.1987) (defining substantially correct wording for charge submissions).

 The Investors argue in response to INA's challenge to the sufficiency of the evidence to support damages that they are entitled to be compensated for their "total loss." *Henry S. Miller v. Bynum*, 836 S.W.2d 160, 162 (Tex.1992). The damages awarded in question twelve amount to two times the cost of each Investors' interests in Overlord III and/or IV.[10] The damages represent the "benefit of the bargain," an appropriate measure of damages under the DTPA. *See Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex.1984). The Investors testified their investments had no present value, and they argue they were entitled to receive twice the cost of each unit because they were promised at least a two to one return. They further testified they received no cash returns from the investments. They were assured that payments on the promissory notes would be made from the profits generated by the Overlord programs.

In addition, the Investors testified about the hardships the protracted litigation had imposed on them, including their mental anguish.[11] The court recessed temporarily during the emotional testimony of Investors Morris and Red. Investor Morris testified both his job and his marriage suffered under the strain of the litigation. He also testified his health had deteriorated. He told of the hundreds of hours spent on the case, including five or six trips to Nashville to review Commonwealth's documents. Investor Lowe testified to the "agony" and "aggravation" during the preceding six years, and the

countless hours spent on the litigation. We cannot say the jury's determination of damages is manifestly unjust. We find the evidence is legally and factually sufficient to support the damages awarded. We overrule point of error eleven.

## IV. INA'S CLAIMS AND DEFENSES

 First, INA's claim that it is entitled to a set-off or credit for Investor Red's settlement with Gunnels and his employer is waived by failure to assign error in a point of error. TEX.R.APP.P. 74(d); *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex.1990); *San Jacinto River Authority v. Duke*, 783 S.W.2d 209, 210 (Tex.1990).

In point of error twenty-seven, INA argues the trial court erred in refusing to enter JNOV and in refusing to disregard the jury's findings with respect to its claims under the indemnification agreements and the promissory notes because the evidence supporting INA's affirmative claims was factually or legally sufficient. The jury answered "no" to questions one and two, which inquired whether the Investors were liable to INA under the indemnification agreements and the promissory notes.

 A complaint that the trial court erred in refusing to grant judgment notwithstanding the verdict raises only a no evidence point for appellate review. *Sherman v. First Nat'l Bank in Center, Texas*, 760 S.W.2d 240, 241–42 (Tex.1988). In this case, INA must establish that its claims were proved as a matter of law. We first examine the record for evidence that supports the jury's failure to find for INA on its affirmative claims, while we ignore all evidence to the contrary. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the jury's answer, we will then examine the entire record to determine if the

---

10. The damages found by the jury were as follows:

| | |
|---|---|
| Sherrie and Graham Glass: | $ 40,000 |
| Earl and Audrey Lowe: | $ 40,000 |
| John and Bernice Person | $ 40,000 |
| John W. Morris | $160,000 |
| Rebecca Red | $120,000. |

The jury also found INA's actions were committed knowingly and awarded $5,000 to each of

the above as additional damages. The judgment also includes $2,000 mandatory DTPA damages to each of the above. *See* TEX.BUS. & COM.CODE ANN. § 17.50(b)(1).

11. The jury found INA violated the DTPA "knowingly." Therefore, mental anguish damages are recoverable. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 117–18 (Tex.1984).

contrary proposition is established conclusively. *Id.*

 INA's claim under the indemnification agreements is one for breach of contract. There is evidence in the record that INA failed to comply with the terms of the bond. The bond required it to refuse payment if the lender's demand was not made in accordance with the bond. There is some evidence the lender made an untimely demand and improperly accelerated the maturity of the notes. INA then breached its contracts with the Investors by improperly honoring the lender's untimely demands. Therefore, there is some evidence to support the jury's finding that the Investors were not liable to INA under the agreements. The trial court properly denied INA's motion for JNOV.

Furthermore, the Investors argue the notes and indemnification agreement are unenforceable because they were executed contemporaneously with, and were procured by, fraud or in violation of the TSA. *See* TEX.REV. CIV.STAT.ANN. art. 581–33K (Vernon Supp. 1995). Section 33K reads:

Unenforceability of Illegal Contracts. No person who has made or engaged in the performance of any contract in violation of any provision of this Act or any rule or order or requirement hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

The jury found INA liable as an aider and abettor under the TSA. Article 33F(2) of the TSA provides in relevant part:

A person who directly or indirectly with intent to deceive or to defraud or with reckless disregard for the truth or the law materially aids a seller, buyer or issuer of the security is liable under [this Act] jointly and severally ... to the same extent as if he were the seller, buyer or issuer.

TEX.REV.CIV.STAT.ANN. art. 581–33(F)(2) (Vernon 1964).

 This finding is supported by the evidence in the record. Professor Raymond Britton, the Investors' expert, testified that both the failure to disclose the Meatte injunction and failure to adequately disclose the poor performance of past Commonwealth programs to the Investors were violations of the TSA. He also opined that INA materially aided Commonwealth in reckless disregard for the truth and the law. INA failed to ensure its agents acting in Texas were licensed. INA took an active role in formulating, marketing, and promoting the transaction. INA's underwriting, including evaluation of the merits of programs, the use of its name as a marketing tool, and the financing through use of surety bonds were critical to the success of the programs, as confirmed by the testimony of Trimpoli, Meatte, Mitchell and Phillips. Burgess, as vice-president of Phillips, discovered the Meatte injunction during his due diligence for INA. Ace also knew of the injunction, and was both INA's statutory agent and its agent through apparent authority. INA should have ensured the Meatte injunction was disclosed in the PPMs for the Overlord programs as it had been for earlier programs.

 Because the Investors established securities fraud as a defense to payment of the notes, INA was required to establish it was a holder in due course to prevail on its affirmative claims.[12] *See Jones v. Missouri Sav. Ass'n,* 756 S.W.2d 423, 424–25 (Tex. App.—Dallas 1988, no writ) (a holder in due course has the burden to establish such status if a defense to the claim exists); *see also Cartwright v. MBank Corpus Christi, N.A.,* 865 S.W.2d 546, 551 (Tex.App.—Corpus Christi 1993, writ denied). INA received the notes by assignment from the lender after default. As a mere assignee, it took the notes subject to defenses. *See Estrada v. River Oaks Bank & Trust Co.,* 550 S.W.2d 719, 728 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). Even if the banks that transferred the notes to INA had been holders in due course, those rights were not

---

12. A holder is defined as one who is in possession of a negotiable instrument, drawn, issued, or endorsed to him. TEX.BUS. & COM.CODE ANN. § 1.201(20) (Vernon 1968). A holder in due course is a holder who takes the instrument for value, in good faith, and without notice of any defense against it or claim to it by another. TEX.BUS. & COM.CODE ANN. § 3.302 (Vernon 1968).

transferred to INA because it was a party to the securities fraud. *Id.* at 728 n. 6.; *see* Act effective September 1, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex.Gen.Laws 2343, 2416 (current version at TEX.BUS. & COM.CODE ANN. § 3.203(b) (Vernon Supp.1996)). In addition, INA waived any claim to holder in due course status by failing to submit a jury question.[13] *See* TEX.R.CIV.P. 279. Moreover, INA was not a holder in due course because it had notice of the fraud and securities violations. *See* TEX.BUS. & COM.CODE ANN. § 3.302 (Vernon 1968). INA had notice of the Meatte injunction before bonding the Overlord programs. In addition, it had notice of fraud before it received the promissory notes by assignments from the lender. In early 1987, phone calls were made and letters were written to both the lender and INA informing them of "considerable fraud." Steven Hollberg, Waite's "salvage and subrogation" supervisor, admitted that by the summer of 1987 INA had knowledge of substantial fraud claims involving Overlord III and IV.

Because INA is not a holder in due course, it took the notes subject to all valid claims and defenses to them. *See* TEX. BUS. & COM.CODE ANN. § 3.306 (Vernon 1968); *Crossland Sav. Bank FSB v. Constant*, 737 S.W.2d 19, 22 (Tex.App.—Corpus Christi 1987, no writ). As there is evidence supporting the Investors' fraud defense, the record supports the jury's answers to questions one and two, which found the Investors were not indebted to INA. Therefore, we overrule point of error twenty-seven.

In point of error twenty-eight, INA claims the court erred in refusing to enter judgment on its claims of estoppel and ratification, which it contends were established by the evidence. The jury answered "no" to questions seventeen and eighteen inquiring whether the Investors were estopped from making a claim against INA or whether they ratified INA's conduct.

▮ The common law defenses of estoppel and ratification are not available in DTPA or TSA actions. *See Smith v. Baldwin,* 611 S.W.2d 611, 616 (Tex.1980) (recognizing a primary purpose of the DTPA was to provide consumers a cause of action for deceptive acts while relieving them of common law defenses and burdens of proof); *Kuehnhoefer v. Welch,* 893 S.W.2d 689, 692 (Tex.App–Texarkana 1995, writ denied) (holding estoppel is not a defense to a DTPA action); *Shenandoah Assoc. v. J & K Prop., Inc.,* 741 S.W.2d 470, 496 (Tex.App.—Dallas 1987, writ denied) (on rehearing) (holding DTPA claim not subject to waiver and ratification); *Mayfield v. Troutman,* 613 S.W.2d 339, 344 (Tex. Civ.App.—Tyler 1981, writ ref'd n.r.e) (holding a contract in violation of the TSA is not subject to ratification). We overrule point of error twenty-eight.

Finally, in point twenty-nine, INA argues the court should have entered JNOV and disregarded the jury's findings because the Investors' claims were barred by collateral estoppel. INA contends a federal appellate case concerning another Overlord investor controls this case.

INA sued other investors in federal court for recovery under its indemnity agreement. On appeal, the Fifth Circuit upheld the summary judgment in INA's favor finding Taylor, the only investor who appealed, was liable under the agreement. *Insurance Co. of N. America v. Dealy,* 911 F.2d 1096, 1100 (5th Cir.1990). The court acknowledged Taylor may have described a complex securities fraud perpetrated on the Overlord investors, but he offered no evidence the surety was a party to any alleged fraud or a coconspirator in it. *Id.* It found the mere contention that the surety may have had knowledge that the general partner engaged in prior securities law violations was insufficient to establish the surety was an aider an abettor. *Id.* The court found the INA–Overlord link arose in an ordinary investment business context, with no indication of a clear proof of intent to violate securities laws required for liability under the federal act. *Id.* at 1101. The court applied common law agency principles to determine the scope of knowledge of reputed wrongdoing imputable

---

**13.** The Investors tendered a question on INA's status as a holder in due course, but the trial court refused its submission.

to INA. It recognized that under Texas law, an agent of the limited partnership could qualify as a dual agent with respect to filing of applications and collection of fees for the surety. However, there was no evidence in the record of any indication of agency authority beyond this "virtually clerical function." *Id.*

 Collateral estoppel precludes relitigation of identical issues of fact or law which were actually litigated and essential to the prior judgment. *Eagle Prop., Ltd. v. Scharbauer,* 807 S.W.2d 714, 721–22 (Tex. 1990). Because the *Dealy* judgment arose in federal court, INA argues that the federal law of collateral estoppel applies. The doctrine of mutuality of parties no longer applies in federal collateral estoppel; however, it remains essential that the party against whom estoppel is asserted has litigated and lost in an earlier action. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979). Thus, collateral estoppel applies only if the party against whom the doctrine is being asserted was a party, or in privity with a party, in the prior litigation. *Eagle Properties,* 807 S.W.2d at 721. Collateral estoppel does not apply in this case because the parties were not cast as adversaries in the first action. *Dealy* did not involve any of these Investors, nor were they in privity with the investor in that case. In addition, the opinion in *Dealy* primarily discussed alleged violations of federal securities laws. DTPA violations were not at issue. *See Tarter v. Metropolitan Sav. & Loan Ass'n,* 744 S.W.2d 926, 928 (Tex.1988) (holding collateral estoppel did not bar subsequent suit since the DTPA claim had not been litigated in the previous case). There is also no mention of Waite's involvement in the opinion. It is apparent that the evidence presented in connection with INA's summary judgment was not developed to the level in this case. For these reasons, the Fifth Circuit's decision in *Dealy* does not collaterally estop the Investors from bringing their action in this case. We overrule point of error twenty-nine.

## V. ADMISSION OF EVIDENCE

In point of error twenty-six, INA argues the trial court erred in admitting evidence or allowing certain matters before the jury. INA cites to at least ten different items or types of evidence allowed before the jury that it considered prejudicial.

 INA has failed to show these matters, even if improperly admitted, were calculated to cause and probably did cause the rendition of an improper judgment. *See Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 230 (Tex. 1990); TEX.R.APP.P. 81(b)(1). When erroneously admitted evidence is merely cumulative or does not concern a material issue dispositive of the case, the error is harmless. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). Harmfulness is determined by looking at the entire record to see whether the judgment was controlled by the testimony that should have been excluded. *Id.*

 INA argues most strenuously against admission of the Stawowy Report, which purports to supply evidence of INA's wrongdoing. This report, prepared by Joe Stawowy, Senior Underwriter for Employers Reinsurance Corporation, outlined Waite's underwriting procedures. The report indicated only positive due diligence reports would be furnished by Bancapital Corporation. INA's objections are not preserved for our review, however. At the conclusion of the evidence and after the jury retired for deliberations, a discussion of which exhibits would be furnished the jury occurred. At that time, a question arose about whether the Stawowy report had been admitted. The trial court had no record of its admission. INA's counsel withdrew its objection to the exhibit. Even if we considered INA's complaint as to this exhibit, harmful error is not shown because the report is cumulative of other testimony and evidence in the record. Waite's underwriting procedures were discussed by other witnesses and outlined in other exhibits. INA failed to establish that "the whole case turns on" this evidence. *See Superior Derrick Serv., Inc. v. Anderson,* 831 S.W.2d 868, 876 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

 INA also complains about the 1983 dealings between Commonwealth and

Phillips, through their respective agents, Trimpoli and Burgess. This broad category includes six letters concerning Commonwealth's request for assistance from Phillips' company in obtaining a $25 million line of credit. INA argues these documents pre-date any relationship between INA and Phillips regarding the oil and gas bonding programs and concern only a request for financing assistance and not the provision of surety bonds. As such, we fail to see how harm from their admission is demonstrated.

▪ INA also objected to the admission of four letters from or to Phillips in 1982 and 1983 concerning solicitation of INA's involvement in oil and gas bonding programs. These letters were authenticated by Phillips, and were relevant to show the background and structure of the INA programs. On appeal, INA complains they are hearsay. INA's only hearsay objection at trial was made to DX–152 and DX–157. Even if the hearsay objections to these two letters were valid, this evidence is merely cumulative of the other letters where no hearsay objection was made.

▪ INA complains on appeal about the admission of statements attributable to Ace, Gunnels or Commonwealth on grounds of hearsay, parol evidence and relevance. Investors Lowe, Morris and Glass were each permitted to testify to the representations made to them by Ace to induce their investments. Investor Red, was permitted to testify to statements made to her by broker Gunnels to induce her investment. INA waived its complaints as to parol evidence and relevance because it failed to raise those objections at the time the testimony was given. The statements were not hearsay because they were admissions by a party opponent. *See* TEX.R.CIV.EVID. 801(e)(2)(D). Moreover, they were not offered for the truth of the matter asserted. TEX.R.CIV. EVID. 801(d). They were offered to prove elements of fraud, i.e., as operative facts. *See Williams,* 755 S.W.2d at 885. The statements were clearly relevant as evidence of misrepresentation, reliance and producing cause. There was no error in admitting them.

▪ INA complains the trial court erroneously allowed evidence of the Investors' subjective beliefs. For example, Investor Red testified the involvement of a major insurance company in these transactions led her to conclude that they must be good deals. Other Investors testified about their conclusions after reading the summary of the PPM. The Investors' reasons for investing are admissible to show their state of mind or intent. *See* TEX.R.CIV.EVID. 803(3). This evidence was clearly relevant to show the Investors' reliance and producing cause.

INA complains of admission of the Meatte injunction. Its complaints on appeal concern lack of predicate or foundation. However, INA failed to point out where in the record it objected to lack of foundation, and that complaint is therefore waived. The only objection at trial we have found is one for relevance. The injunction was relevant to show that Meatte, Commonwealth's co-owner, was under SEC injunction prohibiting sale of unregistered securities, yet he was participating in the Overlord programs. Other evidence showed INA had notice of the injunction through its agents.

▪ INA complains of admission of the entire testimony of the Investors' insurance expert, Harold Clark. It contends he was not qualified. Whether a witness qualifies as an expert is within the sound discretion of the trial court. *Lujan v. Tampo Mfg. Co.,* 825 S.W.2d 505, 509 (Tex.App.—El Paso 1992, no writ). Clark testified as to his background and expertise in insurance. We find no abuse of discretion. In addition, the trial court limited Clark's testimony to the nature of suretyship in insurance law. He also testified an agent who takes applications for insurance has a duty to explain the material aspects of coverage. This testimony is cumulative of other testimony about insurance and sureties.

▪ INA also complains it was not permitted to effectively cross-examine the Investors' expert, Professor Britton, concerning the *Dealy* case INA relied upon for its collateral estoppel claim. This complaint is waived. When evidence is excluded, an offer

of proof is required to establish the nature of the evidence excluded. TEX.R.APP.P. 52(b). We are not cited to and can find no offer in the record.

 INA also objected to the admission of Laken Mitchell's testimony regarding his 1985 conversations with INA. Mitchell, Commonwealth's general counsel, testified he had discussions with INA representatives in 1985 concerning the Meatte injunction. Even though these discussions were made after the bonds were issued, they were relevant to show INA had knowledge of the fraud before it was assigned the notes from the lenders. This knowledge would defeat any claim of holder in due course status.

We decline to consider INA's objection to "references to matters not in evidence." Such a broad reference is not sufficiently specific to direct us to any alleged error. TEX.R.APP.P. 74(d). Error, if any, is waived.

In summary, we find no reversible error in the trial court's admission or exclusion of this evidence and overrule INA's point of error twenty-six.

## VI. CONCLUSION

As we have found the jury's verdict on the Investors' DTPA cause of action is supported by the evidence, we need not discuss INA's points of error concerning the Investors' alternative claims under the TSA, for fraud, conspiracy and breach of the duty of good faith and fair dealing. In addition, we do not reach the Investors' cross-point. We affirm the judgment of the trial court.